Jacquelyn M. CHAGNON et al., Appellants,

v.

Griffin BELL et al.

No. 79–1232.

United States Court of Appeals, District of Columbia Circuit.

Argued March 28, 1980.

Decided Aug. 14, 1980.

Rehearing Denied Oct. 14, 1980.

Mark H. Lynch, Washington, D. C., with whom John H. F. Shattuck, Washington, D. C., was on brief, for appellants.

John J. Farley, III, Atty., Dept. of Justice, Washington, D. C., with whom Carl S. Rauh, U. S. Atty., Washington, D. C., at the time the brief was filed and Robert E. Kapp, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellees.

Before ROBINSON and EDWARDS, Circuit Judges, and GASCH,* United States District Court Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge EDWARDS.

EDWARDS, Circuit Judge:

The question presented by this appeal is whether the District Court correctly ruled that the Attorney General of the United States, and those acting under him and at his direction, were entitled to a summary judgment on grounds of official immunity. Appellants filed suit in District Court on

April 11, 1978, seeking money damages and equitable relief, after learning that appellees had overheard their conversations while conducting a warrantless wiretap on the telephone at the residence of a suspected foreign agent (Truong).

Appellants assert that, since the warrantless wiretaps violated settled law, the District Court was without justification in granting qualified immunity to the appellees in this case. Appellants also contend that the grant of summary judgment by this District Court was inappropriate because they "were denied the opportunity to conduct any discovery and [because] there were factual disputes as to: (a) whether defendants had probable cause to believe that the target of the wiretap was the agent of a foreign power; (b) whether the wiretap was initiated and conducted for prosecutorial rather than foreign intelligence purposes; (c) whether defendants reasonably minimized the interception of calls unrelated to the purpose of the surveillance; and (d) whether defendants intentionally, wilfully, and recklessly violated plaintiffs' constitutional and statutory rights." Appellants' brief, pp. 1–2.

Appellants based their claim for relief on constitutional protections allegedly afforded them by the First, Fourth, Fifth, and Ninth Amendments, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1976), and 47 U.S.C. § 605 (1976). Appellees moved to dismiss or, in the alternative, for summary judgment. The Honorable John H. Pratt, District Judge, found that the Attorney General had had valid grounds to believe that Truong was acting as a foreign agent and that the warrantless wiretap had violated no clearly established law. Given these findings, the District Court held that the appellees were entitled to qualified immunity as a matter of law and granted the motion for summary judgment. *Chagnon v. Bell*, 468 F.Supp. 927, 931–33 (D.D.C. 1979).[1]

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. The District Court also ruled that the plaintiffs were not entitled to declaratory relief. *Id.*

In resolving this case in favor of appellees, the District Court was guided by the decision of the Supreme Court in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). In *Butz*, the Supreme Court held that federal executive officials are entitled to qualified immunity when they are sued for damages arising from alleged violations of constitutional rights. In reaching this conclusion, the Court in *Butz* relied on *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (dealing with immunity for state officials), where the Court had held that:

> in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Id.* at 247–48, 94 S.Ct. at 1692.

As did the District Court, we too believe that *Butz* is dispositive of this case. We note in particular that, in *Butz*, the Supreme Court warned that the availability of a damage remedy for illegal official conduct, while an essential tool for the vindication of individual constitutional rights, carries with it a special danger of abuse. As the Court indicated, the public interest in holding all citizens accountable to the law

must be balanced against the related societal need for vigorous exercise of executive authority. 438 U.S. at 506, 98 S.Ct. at 2910. In order to prevent the harassment of federal officials by insubstantial lawsuits, the Court in *Butz* expressly condoned the resolution of cases of this sort by summary judgment. *Id.* at 508, 98 S.Ct. at 2911.

Before granting summary judgment a trial court is to assess carefully an official's pretrial claim that no genuine issue exists material to his entitlement to immunity. In this case, the District Court upheld the appellees' claim of immunity because the conduct complained of violated no clearly established constitutional right and, further, because the record supported no inference of official malice. Because a careful examination of the record reveals no basis for disturbing the judgments of the District Court, we hereby affirm.

This case raises several questions of great significance. Nevertheless, we should note that a number of the matters at issue here are specifically addressed in the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. §§ 1801–1811 (Supp. II 1978), which Congress enacted after the events giving rise to this litigation. It is therefore unlikely that a case of this nature, involving the precise issues here raised, will arise again at any time in the near future.

## I. BACKGROUND.

Appellants instituted this action for damages and injunctive and declaratory relief against Griffin Bell, who was then Attorney General of the United States, and three employees of the Federal Bureau of Investigation (FBI),[2] claiming that an unstated

---

at 933–34. First, there was no indication that the challenged surveillance, which had been terminated, posed an immediate, adverse threat to the appellants. Nothing indicated that there would be a future warrantless wiretap during which appellants' conversations would be overheard. Second, the passage of the Foreign Intelligence Surveillance Act of 1978, Pub.L.No. 95–511, 92 Stat. 1783 (1978), 50 U.S.C. §§ 1801–1811 (Supp. II 1978), made meaningless a ruling on the validity of the surveillance. Third, the precise constitutional and statutory issues raised by the case had already been

argued to the Court of Appeals for the Fourth Circuit in the appeal of the underlying criminal charges. *See* note 6, *infra*. To the extent that a ruling on the constitutionality of the surveillance was necessary, the District Court viewed the Fourth Circuit as the appropriate forum. Appellants have not appealed this denial of declaratory relief. *See* Appellants' brief, p. 7 n. 3.

**2.** The three named co–defendants were former FBI Director Clarence M. Kelley, former Acting Director Richard Held and Special Agent William Fleshman, Jr.

number of their conversations were overheard during a period of warrantless electronic surveillance of the home telephone of one Truong Dinh Hung.[3] The claims for damages were grounded on the Fourth Amendment[4] and on Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Following cross motions for summary judgment, Joint Appendix ("J.A.") 17, 117,[5] the District Court issued a Memorandum Opinion and Order sustaining the appellees' position. J.A. 127–34; opinion reported at 468 F.Supp. 927 (D.D.C.1979).

### 1. *The Truong Wiretap*

On May 5, 1977, FBI Director Clarence Kelley and Deputy Secretary of State Warren Christopher notified Attorney General Bell of a serious breach of State Department security involving the unauthorized transmission of classified State Department documents to representatives of a hostile foreign government. In the course of briefings on the following day, the Attorney General learned that a joint FBI/CIA counterintelligence investigation directed at suspected agents of the Socialist Republic of Vietnam (SRV) had focused on Truong Dinh Hung, a person known not to be a citizen of the United States. On a number of occasions in the recent past, Truong had employed an undercover FBI/CIA courier to deliver packages to SRV representatives in Paris, France and to transmit material from those representatives to Truong in the United States. A few days prior to May 6, federal agents discovered a number of classified State Department documents in a Truong shipment to Paris. By May 6, the FBI was convinced that Truong was acting as an intelligence agent for the SRV.

State Department officials expressed their concern to the Attorney General that unchecked dissemination of such documents might prejudice United States relations with foreign countries, particularly in Southeast Asia. Furthermore, it was feared that the contents of some of the classified documents might identify and could perhaps endanger individuals, including officials of foreign governments, who were supplying information to the United States Government. Because the State Department had no information as to the inside source of the document leaks, the magnitude of these risks was considered to be particularly substantial. Deputy Secretary Christopher informed the Attorney General that in his estimation this compromise of security presented "a very grave problem."[6]

On the basis of the May 6 briefings, the Attorney General determined that Truong was acting as part of a network of SRV agents. Accordingly, pursuant to authority delegated to him in writing by the President, the Attorney General authorized an FBI wiretap of Truong's home telephone on May 9, 1977. No prior judicial approval for the surveillance was sought.

The Attorney General viewed the Truong wiretap as indispensable to an effective counterintelligence operation. He stated that:

It was imperative, in my view, to determine the extent of the material already

---

**3.** Truong, the target of the surveillance, is not a party to this action.

**4.** *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 395, 91 S.Ct. 1999, 2004, 29 L.Ed.2d 619 (1971), where the Court noted that, "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." This court, relying on *Bivens*, has held an award of monetary relief to be available in cases other than those involving Fourth Amendment claims. *See, e.g., Dellums v. Powell*, 566 F.2d 167, 194–95 (D.C.Cir.1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3147, 57 L.Ed.2d 1161 (1978). Given our disposition of this case

on the immunity issue, we find it unnecessary to consider whether money damages may be given to remedy other types of constitutionally protected interests.

**5.** Plaintiffs' Cross–Motion was for partial summary judgment declaring the warrantless wiretap *per se* violative of the Fourth Amendment.

**6.** J.A. 52. This statement is taken from the testimony of the Attorney General of the United States given March 20, 1978 in the related case of *United States v. Humphrey*, 456 F.Supp. 51 (E.D.Va.1978), *aff'd United States v. Truong*, 629 F.2d 908 (4th Cir., 1980).

compromised, the source of the materials within this Government, the identity and scope of Truong's intelligence network, and the extent of this network's activities. J.A. 25. The decision to authorize the surveillance without seeking a judicial warrant apparently reflected the Attorney General's routine approach to counterintelligence investigations. He believed that no court order was required where (1) the Attorney General of the United States was "satisfied that the subject of the surveillance [was] an agent of a foreign power," and (2) the purpose of the surveillance was "to protect national security information against foreign intelligence activities and to obtain foreign intelligence information . . . deemed essential to the security of the United States." J.A. 25.

Electronic surveillance of Truong's home telephone commenced on May 11, 1977 and continued, with renewals authorized by the Attorney General in August and November of 1977, until January 31, 1978, when the indictments of Truong and a Ronald Humphrey were returned in the Eastern District of Virginia. Conversations overheard in the course of the wiretap had led to the identification of Ronald Humphrey, an officer of the United States Information Agency, as one suspected source of Truong's access to classified material. During the entire period of the surveillance, the Attorney General remained convinced that the FBI counterintelligence investigation had not yet determined the full extent of Truong's intelligence activities or identified all of his intelligence sources.

## 2. The Criminal Trial of Humphrey and Truong

At their espionage trial, Humphrey and Truong moved to suppress all evidence obtained as a result of the Truong surveillance.[7] At a two–day evidentiary hearing on the motion, the trial court received documentary evidence and affidavits and heard testimony, including from the Attorney General as to the foreign counterintelligence context of the surveillance and his rationale for its initiation and conduct.

In ruling on the suppression motion, District Court Judge Bryan submitted the propriety of the Truong surveillance to a three–step analysis. First, as to the Government's reliance on the so–called "foreign agent exception" to the warrant requirement, the court concluded that traditional Fourth Amendment doctrine permits exception to the warrant clause when the Attorney General, acting at the direction of the President, undertakes surveillance of an agent of a foreign power for foreign intelligence or counterintelligence purposes. 456 F.Supp. at 55–57. Second, the court determined that the Truong investigation genuinely involved foreign intelligence. Because the Attorney General had initiated the wiretap against an agent of a foreign power "for the primary, or even sole, purpose of foreign intelligence gathering," the court held that the Attorney General properly had invoked the foreign agent exception. Id. at 58.

Third, the court analyzed the duration of the surveillance in light of an independent requirement of reasonableness under the Fourth Amendment. On the theory that reliance on the foreign agent exception was reasonable only so long as foreign intelligence gathering remained the "primary purpose" of the investigation, the court concluded that the warrantless intrusion became unreasonable as of July 20, 1977, when the focus of the surveillance became prosecutorial. The court reached this conclusion even though the investigation continued to retain a parallel foreign intelligence purpose. Accordingly, the judge suppressed all of the wiretap evidence gathered after July 20, 1977. Id. at 59.

Humphrey and Truong were convicted on six of the seven counts in the indictment.

---

7. *United States v. Humphrey, supra* note 6. That evidence included, in addition to the conversations seized pursuant to the wiretap challenged here, evidence seized in the course of a microphone surveillance of Truong's apartment and a video surveillance of Humphrey's office at USIA.

In their appeal of that conviction to the United States Court of Appeals for the Fourth Circuit, Truong and Humphrey assigned as error Judge Bryan's ruling on the suppression motion, asserting that because the warrantless surveillance was illegal in its entirety, all evidence procured thereby should have been excluded. *See* note 12, *infra.*

### 3. *The Appeal in the Present Case*

■ The appellants filed this civil action in District Court on April 11, 1978. The complaint sought damages because appellees overheard the individual appellants' telephone conversations with Truong in the course of the Truong wiretap.[8] In response, the Attorney General[9] moved to dismiss or, in the alternative, for summary judgment and for a protective order staying discovery pending resolution of the dispositive motion. The District Court granted the stay of discovery over appellants' opposition.

In support of his motion for summary judgment, the Attorney General submitted the complete transcript of his testimony at the suppression hearing in *United States v. Humphrey*, along with his affidavit filed in that action, and the Memorandum Opinion of District Court Judge Bryan summarized above. These documents provided the foundation for the Attorney General's Statement of Material Facts submitted pursuant to Local Rule 1–9(h). J.A. 19. Appellants filed one counteraffidavit, a statement of issues as required by Local Rule 1–9(h) and an affidavit of counsel pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. The Attorney General argued that the record demonstrated the absence of any genuine issue as to his entitlement to qualified immunity under *Butz* and that, therefore, he was entitled to summary judgment on the claims for damages.[10]

Appellants' opposition to summary judgment consisted in essence of claims that, because the facts of the Truong surveillance gave rise to an inference of its illegality, a genuine dispute existed as to the Attorney General's entitlement to immunity. J.A. 122–23.

After finding that the Attorney General had had valid grounds to believe Truong was acting as an agent of a foreign power, the District Court concluded that the warrantless surveillance had violated no "clearly established" law and that, therefore, the Attorney General was entitled to official

---

**8.** Appellants' claims for relief based on alleged FBI surveillances of their home telephones were dismissed by the District Court on summary judgment. Appellants have raised a number of contentions relating to this ruling. We have carefully considered all of these contentions and conclude they are lacking in merit. Accordingly, our opinion focuses on the substantive immunity issue raised by this appeal.

**9.** For convenience, we will refer generally to the Attorney General in discussing the immunity available to appellees collectively. The District Court and the parties consistently have treated the appellees' entitlement to immunity as a question to be determined at the threshold by the Attorney General's entitlement, and we regard that treatment as proper.

As the Court noted in *Butz*, the broad authority of federal executive officials to direct their subordinates carries with it the danger that such power will be abused. For this reason a serious distortion of immunity doctrine would result were courts routinely to hold inferior officials liable for constitutional violations while immunizing those higher up. The potential for abuse of high authority underscores the

necessity for vindication of constitutional guarantees in "an action for damages against the *responsible* official." 438 *U.S.* at 506, 98 S.Ct. at 2910 (emphasis added). Moreover, on the facts of this case, it is clear that the FBI officers were entitled to act in reliance on an official statement of the law by the Attorney General of the United States. *See Smith v. Nixon*, 606 F.2d 1183, 1191 n.47 (D.C.Cir.1979).

Appellants have admitted that the Truong surveillance was initiated and renewed pursuant to the Attorney General's authorization. *See* J.A. 20, 122. Because the FBI appellees, all subordinates of the Attorney General, engaged in the challenged course of conduct entirely at his direction, it is appropriate in this case that their immunity should flow from his. Only if the immunity defense were unavailable to the Attorney General would an independent issue as to the FBI officers' good faith be presented by this appeal.

**10.** Because the District Court relied on the doctrine of *qualified immunity*, in a judgment that we here affirm, we find it unnecessary to rule on appellees' claim of *absolute immunity.*

immunity for the good faith decisions he had made in a situation that required decisive action to protect and promote governmental interests. The District Court also granted appellees' motion for summary judgment on the request for declaratory relief. See note 1, supra.

## II. THE IMMUNITY DEFENSE

### 1. The Bases for the Doctrine of Qualified Immunity

■ Recent decisions of the Supreme Court and of this court have reaffirmed the principle that executive officials are entitled to the protection of the qualified immunity doctrine as enunciated in Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). See, e. g., Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); and Halperin v. Kissinger, 606 F.2d 1192 (D.C. Cir.1979), cert. granted, 446 U.S. 951, 100 S.Ct. 2915, 64 L.Ed.2d 807 (1980). See also Apton v. Wilson, 506 F.2d 83 (D.C.Cir.1974). As has been noted time and again, the qualified immunity doctrine is designed to allow the vindication of individual constitutional rights, while preserving for officials a shield against liability that will serve the public interest in the vigorous exercise of legitimate executive authority.

■ The need for a significant shield of immunity for the discretionary acts of executive officials is traditionally explained on two related grounds. On the one hand, there is a perceived danger that the threat of damage liability will deter public officials from taking decisive and disinterested actions in fulfilling their public commitments. On the other hand, there is the possibility of real injustice occurring if public officials are subjected to liability for discretionary acts taken in good faith to enforce the obligations of public office. See Scheuer v. Rhodes, 416 U.S. at 240, 94 S.Ct. at 1638. See also Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv.L.Rev. 209, 223 (1963). Thus, "however worded the immunity must be such that public school officials understand that action taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity." Wood v. Strickland, 420 U.S. at 321, 95 S.Ct. at 1000. Rather than "a badge or emolument of exalted office," immunity must be seen as "an expression of policy designed to aid in the effective functioning of government." Scheuer v. Rhodes, 416 U.S. at 242, 94 S.Ct. at 1689 (quoting Barr v. Matteo, 360 U.S. 564, 572–73, 79 S.Ct. 1335, 1340, 3 L.Ed.2d 1434 (1959)).

■ The implications of the immunity doctrine for the individual seeking redress for injury caused by official action are clear. The doctrine of immunity assumes official error and some consequent harm to individuals, and yet cautions courts not to impose unfairly upon a public officer "the burden of mistakes made in good faith in the course of exercising his discretion within the scope of his official duties." Wood v. Strickland, 420 U.S. at 319, 95 S.Ct. at 999. As noted in Scheuer v. Rhodes, supra:

> Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all.

416 U.S. at 242, 94 S.Ct. at 1689.

■ The accommodation reached in these cases requires us to acknowledge that, despite the traditional reliance on damage suits as a primary mechanism for the vindication of individual rights,[11] redress may not be available against official action reasonably taken in good faith. Decisions conferring qualified immunity with respect to actions taken by various governmental officials

---

11. See note 4, supra.

are not to be read as derogating the significance of the societal interest in compensating the innocent victims of governmental misconduct. Rather, in each case . . . overriding considerations of public policy nonetheless demanded that the official be given a measure of protection from personal liability.

*Owen v. City of Independence,* 445 U.S. 622, 652–653, 100 S.Ct. 1398, 1416, 63 L.Ed. 2d 673 (1980).

Simply put, the balance struck by immunity doctrine assumes that society has less to lose from the unredressed injury to individuals that may result from immunizing the good-faith mistakes of public officers than from the timidity in the exercise of public office that would attend the threat of damages liability for honest error.

### 2. The Application of Qualified Immunity Doctrine to this Case

At the time of oral argument in this case, the criminal defendants in *United States v. Humphrey, supra* note 6, had challenged the legality of the Truong wiretap in the Fourth Circuit.[12] When questioned from the bench, neither party to this appeal wished us to defer consideration until the Fourth Circuit issued a decision. Had a declaration on the constitutional and statutory propriety of the surveillance been necessary to our decision of this appeal, "considerations of intercircuit comity and the concomitant husbanding of scarce judicial resources" would have made such deferral of consideration appropriate. *See, e. g., County of Los Angeles v. Marshall,* 631 F.2d 767, at 768 (D.C.Cir. 1980). Furthermore, adjudication of the legality of the surveillance in the Fourth Circuit is particularly appropriate, as the record demonstrates that that is the forum calculated to provide the concrete factual setting that sharpens the deliberative process especially demanded for constitutional decisions. *See United States v. UAW,* 352 U.S. 567, 591, 77 S.Ct. 529, 541, 1 L.Ed.2d 563 (1957).

With this in mind, the issue in this case is narrowly focused. The simple question for resolution here is, on the record before the District Court, and assuming the illegality of the challenged wiretaps, whether there was any genuine issue of fact material to the Attorney General's claim of qualified immunity.

▉ In deciding this question, we assume that the Attorney General, as the ranking law enforcement official in the Federal Government, must be held to know the relevant law. Nevertheless, "since the options which a chief executive and his principal subordinates must consider are far broader and far more subtle than those made by officials with less responsibility, the range of discretion must be comparably broad." *Scheuer v. Rhodes,* 416 U.S. at 247, 94 S.Ct. at 1692.

▉ In *Wood v. Strickland, supra,* the Court held that a school board member would lose immunity only if

he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student.

420 U.S. at 322, 95 S.Ct. at 1001. Only one of these elements need be present in order for an official to lose his immunity from suit. *See Halperin v. Kissinger,* 606 F.2d at 1209.

▉ In *Procunier, supra,* the Court specifically addressed the question of the proper application of the objective element of the *Wood* test when an official has been required to act in an unsettled area of law. Unless the existence of a constitutional right was "clearly established" at the time

---

12. At the time of oral argument in this case, the Fourth Circuit had yet to rule on the legality of the wiretaps in the appeal from the criminal case. However, on July 17, in a unanimous

opinion on this point, the Fourth Circuit affirmed Judge Bryan's decision upholding the legality of the wiretaps. *United States v. Humphrey,* 629 F.2d 908, at 912–917 (4th Cir. 1980).

the challenged action was taken, the Court held that an official could not, as a matter of law, be deprived of official immunity on the basis that he "knew or should have known" that his actions violated that right. Thus, under the first part of the *Wood v. Strickland* rule, the immunity defense would be unavailable only if

> the constitutional right allegedly infringed by [petitioners] was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm.

*Procunier v. Navarette,* 434 U.S. at 562, 98 S.Ct. at 860.

 In *Butz, supra,* the Supreme Court merely reaffirmed the continuing vitality of the *Procunier* rule. Thus, *Procunier* and *Butz* provide explicit instruction to the trial court: when a defendant interposes a good-faith defense to a charge of official misconduct, the court must determine as a matter of law whether the charge states a violation of a right that has been authoritatively declared.

 Each of the alleged issues of material fact upon which appellants relied in opposing summary judgment is in essence a claim that the Attorney General "knew or should have known" that the Truong surveillance violated appellants' constitutional rights.[13] As we have explained, absent malice, such a claim defeats an immunity defense only in an area of "clearly established" law. Whether evaluated by reference to Supreme Court and other judicial precedent, to presidential practice, or to then existing congressional legislation,[14] the state of the law with respect to electronic surveillance of foreign agents of foreign powers was, at best, unsettled in 1977–1978, the period of the Truong wiretap.

*The Case Law*

Our review of the applicable case law reveals that the Supreme Court explicitly left unanswered whether there exists a national security exception to the warrant requirement. For example, in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the majority reserved the issue of the status of national security wiretaps, noting that it had not reached the question "[w]hether safeguards other than prior authorization by a magistrate would satisfy the Fourth Amendment" in such circumstances. *Id.* at 358 n.23, 88 S.Ct. at 515.

*United States v. United States District Court (Keith),* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), the Supreme Court's most recent discussion of the application of the Fourth Amendment to national security surveillance, provided only a partial answer to the question left open in *Katz.* The issue posed in *Keith* was whether the President, acting through the Attorney General, had the power to authorize warrantless electronic surveillance in a case where the threat to national security came from a domestic organization. Despite the fact that "[t]he use of such surveillance in internal security cases has been sanctioned more or less continuously by various Presidents and Attorneys General since July 1946," *id.* at 310, 92 S.Ct. at 2133, the Court held that the Fourth Amendment demanded a warrant procedure in any case where the perceived threat to national security emanated from an organization "composed of citizens of the United States and which has no significant connection with a foreign power, its agents or agencies." *Id.* at 309 n.8, 92 S.Ct. at 2133. The limited scope of the ruling in *Keith* was highlighted by an observation in the opinion that:

> [w]e have not addressed, and express no opinion as to, the issues which may be

**13.** *See* Appellants' Statement of Genuine Issues As To Which Material Facts Are Either In Dispute Or Unavailable To Plaintiffs. J.A. 123.

**14.** A plurality of this court in *Zweibon v. Mitchell (Zweibon I),* 516 F.2d 594, 671 n.274 (D.C.Cir.1975) *(en banc), cert. denied,* 425

U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976), identified these as appropriate factors for consideration in determining the reasonableness of a belief in the legality of warrantless wiretapping.

involved with respect to activities of foreign powers or their agents.

*Id.* at 321–22, 92 S.Ct. at 2139. The Court also noted several sources of authority for "the view that warrantless surveillance . . . may be constitutional where foreign powers are involved." *Id.* at 322 n.20, 92 S.Ct. at 2139. In light of these statements, it is plain that the Supreme Court in *Keith* left unanswered the question whether a foreign agent exception to the warrant requirement exists.

The case law in this circuit is no less equivocal on the question. In *Zweibon v. Mitchell (Zweibon I)*, 516 F.2d 594 (D.C. Cir. 1975) (*en banc*), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976), the plurality opinion expressed a view that, absent exigent circumstances, all warrantless electronic surveillance is unreasonable and, hence, *per se* violative of the Fourth Amendment. *Id.* at 614. *Zweibon I* involved a situation where the Attorney General, acting pursuant to presidential directive, had authorized the warrantless wiretap of a domestic organization that was viewed as a threat to the nation's foreign relations. Although some of the plurality's dicta in *Zweibon I* sweeps broadly, the holding of the court is plainly restricted. Thus, the plurality opinion expressly notes that:

> We hold today *only* that a warrant must be obtained before a wiretap is installed on a *domestic organization that is neither the agent of nor acting in collaboration with a foreign power.*

*Id.* at 614 (emphasis added). Thus, read in its broadest light, *Zweibon I* restricted the

potential reach of the foreign agent exception by explicitly eliminating from its purview surveillance aimed at individuals or domestic organizations not acting on behalf of a foreign power. The *Zweibon I* court never squarely ruled that the putative foreign agent exception to the warrant requirement does not exist.[15]

In view of these opinions, we cannot accept appellants' position that *Zweibon I*, or any other decision, authoritatively eliminated the foreign agent exception. Appellants' contention, that in authorizing the warrantless wiretap of Truong's telephone, the Attorney General "ignore[d] *Zweibon I*," thereby acting "unreasonably and at [his] peril,"[16] is refuted by the very language of the *Zweibon I* decision. *Zweibon I* thus cannot be seen to furnish an adequate basis for claiming a "clearly established" constitutional right protecting appellants from having their conversations overheard in the course of a warrantless surveillance of a foreign agent's telephone.[17]

### *Presidential Practice*

Examination of presidential practice in this area lends further support to the District Court's finding that the Truong tap violated no "clearly established" law. As we suggested earlier, every President since Franklin D. Roosevelt has claimed the "inherent" constitutional power to authorize warrantless surveillance in cases vitally affecting the national security. Furthermore, all Presidents to hold office since *Katz* was decided have advocated a broad exception to the warrant requirement for surveillance

---

**15.** The court in *Zweibon I* recognized that presidentially authorized electronic surveillance in the area of national security had continued openly, as an accepted practice in the executive branch, in the decade following the issuance of the decision in *Katz*. *See* 516 F.2d at 618 n.66. *See also Keith, supra*, 407 U.S. at 310–11, 92 S.Ct. at 2133.

**16.** Appellants' reply brief, p. 8.

**17.** Other circuit courts in the pre–1977 to 1978 period had recognized a foreign agent exception of varying scope. *See, e. g., United States v. Butenko*, 494 F.2d 593 (3d Cir.) (*en banc*), *cert. denied*, 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974); *United States v. Brown*,

484 F.2d 418, 426 (5th Cir. 1973), *cert. denied*, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). Appellants were unable to cite a single case that had flatly rejected the foreign agent exception. The Truong situation required a judgment to be made, not merely within a generally unsettled and evolving area of law, but on a *specific* question *explicitly* reserved in earlier relevant decisions. If this were a case where an official sought to defend a particular decision merely on the basis of uncertainty or debate in a general doctrinal area, we would be faced with a more subtle and difficult determination than the one required here.

targeted at agents of foreign governments.[18] Indeed, public and congressional recognition of the consistency of such assertions of presidential power, and of the general judicial reluctance to proscribe them, provided the impetus for a five–year effort to enact legislation to establish a judicial warrant requirement and other procedures covering electronic surveillance in a foreign intelligence or counterintelligence context.[19] These efforts culminated in the passage of the Foreign Intelligence Surveillance Act of 1978.[20]

## Legislation

■ Just as the Attorney General could have found no authoritative judicial or presidential statement proscribing warrantless wiretaps such as the Truong surveillance, any search for definitive legislative guidance would have been futile. Because Title III, the only relevant legislation, "expressly does not limit the President's constitutional power to wiretap in national security situations," *Halperin v. Kissinger*, 606 F.2d at 1202, and because the Truong surveillance was genuinely based on national security concerns, Title III does not apply to this case. Furthermore, since Congress made the application of Title III turn on the future course of constitutional law,[21] it is self–evident that Title III provided the Attorney General no guidance in the Truong situation.[22]

As our previous cases demonstrate, when the foreign agent exception is invoked to justify warrantless surveillance, courts must be alert to the possible pretextuality of the claim. Here the good faith defense based on a presumed foreign agent exception succeeds because this record demonstrates a "direct link between the wiretap target and a foreign interest as a justification for surveillance" and because the surveillance was "reasonably intended to guard national security data from foreign intelligence agencies." *Halperin v. Kissinger*, 606 F.2d at 1204. The record was devoid of facts from which contrary inferences could be drawn. Significantly, appellants, in opposing summary judgment, left uncontested the Government's statements that "the Attorney General had determined that Truong Dinh Hung was acting as a foreign power" and that he had instituted the Truong wiretap as a foreign national security surveillance. The undisputed validity of the Attorney General's professed national security concerns was an essential prerequisite to the District Court's conclusion that the warrantless wiretap contravened no clearly established law. This case is plainly distinguishable from cases involving the incantation of the foreign security shield by governmental defendants where substantial question as to the pretextuality of the claim exists. *See, e. g., Smith v. Nixon*, 606 F.2d

---

**18.** *See Keith*, 407 U.S. at 310–11, 92 S.Ct. at 2133, 32 L.Ed.2d 752; *Zweibon I*, 516 F.2d at 616–20. *See generally* Shapiro, *The Foreign Intelligence Surveillance Act: Legislative Balancing of National Security and the Fourth Amendment*, 15 Harv.J.Legis. 119, 136–46 (1977).

**19.** *See generally* Shapiro, *supra* note 18.

**20.** Pub.L.No. 95–511, 92 Stat. 1783 (1978) (codified at 50 U.S.C. §§ 1801–1811 (Supp. II 1978)). The Act specifies procedures, including a warrant procedure, for wiretapping and eavesdropping of "agents of a foreign power" and participants in terrorist acts. § 101(b) & (c).

**21.** As was noted in *Zweibon I*, the language and the legislative history of the so–called "national security proviso" of Title III reflected a congressional intent not to impose a statutory warrant requirement in any case in which no

warrant was constitutionally mandated. 516 F.2d at 614 n.46. That proviso contained in § 2511(3) of Title III disclaims any congressional intent *inter alia* to "limit the constitutional power of the President to take such measures as he deems necessary . . . to obtain foreign intelligence information deemed essential to the security of the United States or to protect national security information against foreign intelligence activities." Section 2511(3) was repealed by § 201(c) of the Foreign Intelligence Surveillance Act of 1978.

**22.** As to the immunity issue at the heart of this case, the immunity available to the Attorney General under § 2520 of Title III is in any case identical to the common law good faith defense applicable to appellants' Fourth Amendment claim. *See Halperin v. Kissinger*, 606 F.2d at 1209 n.115.

1183, 1188 (D.C. Cir. 1979) (allegation that wiretap initiated to uncover sources of news stories "personally embarrassing" to governmental defendants uncontradicted in record); *Halperin v. Kissinger*, 606 F.2d at 1204–05 (evidence that Government falsely relied on national security rationale as a pretext to justify politically motivated surveillance).

### 3. *Application of the Fourth Amendment*

Appellants' numerous arguments that the Truong search was unreasonable under the Fourth Amendment fails to advance our immunity analysis. Appellants' attempts to equate the Fourth Amendment standard of reasonableness with the "reasonableness" inquiry a court conducts in evaluating an immunity defense misconceives the application of the immunity doctrine. A Fourth Amendment reasonableness assessment is a definitive determination of the legality of the tap, after the tap was conducted. Thus, to term a concededly illegal search or seizure "unreasonable" in constitutional terms is merely to state a legal conclusion. In contrast, the essential function of the reasonableness analysis under the objective element of the immunity doctrine is to carve out an area of protected illegal conduct or mistake. Yet appellants turn a blind eye to this simple truth. Having conceded the point that it "has not been conclusively decided by any court" that the Fourth Amendment requires a warrant authorizing surveillance of a foreign agent (*see* Plaintiffs' Opposition to Defendants' Motion for Order Staying Discovery at 3 n.*), appellants nevertheless make the anomalous suggestion that the Attorney General should be held to have acted "unreasonably and at [his] peril" in ignoring applicable precedent. Appellants' reply brief, p. 8. This we cannot do.

▬▬▬ Appellants alternatively argue that even if his reliance on a foreign agent exception should not, by itself, deprive the Attorney General of immunity, genuine issues as to the particulars of the wiretap still made summary judgment inappropriate. Appellants claim that, because the Truong tap was instituted without probable cause, because it had a "prosecutorial purpose," and because it reflected inadequate "minimization," genuine issues as to whether the wiretap was "unreasonable" precluded summary judgment on the immunity defense. Upon careful inspection, these additional arguments reveal the same flawed logic and mistaken legal premises earlier described. Whether official action was "reasonable" under the Fourth Amendment is simply not the appropriate focus of immunity inquiry. Rather, the question is whether the conduct complained of transgressed "clearly established" constitutional limits. As the District Court correctly observed, the immunity doctrine precludes liability for "mere mistakes in judgment, whether the mistake is one of fact or one of law." 468 F.Supp. at 933 (quoting *Butz v. Economou*, 438 U.S. at 507, 98 S.Ct. at 2911). A bare claim of official error, however, persuasively asserted, is not a sufficient predicate for depriving an official of the immunity shield.

▬▬▬ Appellants' probable cause argument ignores this fundamental principle of immunity doctrine. At the outset, we note that at the time the wiretap was installed, there was as yet no authoritative standard setting forth the kind and quantity of information necessary to justify foreign security surveillance.[23] The *Keith* opinion made this clear. There the Court, noting that the Fourth Amendment protection does not admit of rote application, indicated that the Constitution does not mandate that a criminal standard of probable cause be met for a warrant to issue for domestic security surveillance. Indeed, *Keith* seemed to invite a warrant procedure that significantly departs from the criminal standard. 407 U.S. at 322–23, 92 S.Ct. at 2139. The rationale for this departure applies with equal if not greater force in the context of foreign security. While *Keith*

---

**23.** Appellants have never challenged the Attorney General's claim that the surveillance was instituted in full compliance with Executive Order 11905, 41 Fed.Reg. 7703 (1976), one "clearly established" source of guidance. *See* Appellees' brief, p. 33.

appeared to contemplate, but failed to define, a somewhat relaxed version of probable cause in the context of domestic surveillance, the question of probable cause in the foreign security area was simply not discussed.[24]

Appellants' contentions regarding the scope and duration of the Truong tap are equally unpersuasive given the unsettled nature of the law at the time when the wiretaps occurred.[25]

Appellants further contend that, because of inadequate "minimization," the Truong tap violated "clearly established" Fourth Amendment precepts of reasonableness. The Fourth Amendment requires that a judicial order authorizing electronic surveillance affords protections that permit "no greater invasion of privacy . . . than [is] necessary under the circumstances." *Katz v. United States*, 389 U.S. at 355, 88 S.Ct. at 513 (quoting *Berger v. New York*, 388 U.S. 41, 57, 87 S.Ct. 1873, 1882, 18 L.Ed.2d 1040 (1967)). Certainly a warrantless wiretap should provide no less protection. Application of this principle to the Truong surveillance, however, unavoidably entailed an exercise of judgment, and uncertainty invites error. Our review of the scope of the Truong surveillance in light of

legal standards "clearly established" at the time persuades us that appellants allege but another instance of possible error that fails, standing alone, to raise an issue material to the immunity question before us.

 In determining the appropriate strategy for the Truong surveillance, the Attorney General had to consider the "necessarily broad and continuing nature of intelligence gathering," which justifies surveillance of a scope far greater than that appropriate to "ordinary crime." *Keith*, 407 U.S. at 320, 322, 92 S.Ct. at 2138–2139. The Court in *Keith* declined to delineate "precise standards for domestic security warrants," inviting Congress to consider standards substantially different than those prescribed in Title III. *Id.* at 323, 92 S.Ct. at 2139. Because, as we have stated above, Title III did not apply to the Truong surveillance, appellants' reliance on Title III minimization doctrine, as according them "clearly established" rights, is unavailing.

Even in the "ordinary" criminal situations covered by the statute, Title III does not provide minimization rules capable of mechanical application. In *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), a Title III case involv-

**24.** In any case, we must reject the notion that a dispute as to the *existence* of probable cause necessarily precludes summary judgment on an immunity defense to a claimed Fourth Amendment violation. The existence of probable cause, however defined, is not a required element of the defense. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339, 1348 (2d Cir. 1972) (reasonableness of belief that probable cause exists rather than existence of probable cause in the constitutional sense must be proved).

**25.** One such challenge rests on the premise that a warrant is required for a foreign security surveillance for any period in which the Government's "primary purpose" is "prosecutorial." Plaintiffs' only source of authority for this premise is *United States v. Butenko, supra* note 17, which supports the proposition that warrantless surveillance of a foreign agent is permissible so long as the "primary purpose" of the surveillance is intelligence gathering. Because the facts in *Butenko* revealed that intelligence had been the "sole purpose" of the tap in question, the court had no occasion to define the reach of the "primary purpose test." Other courts recognizing the foreign agent ex-

ception have placed no such limit on its reach. *See, e. g., United States v. Brown, supra* note 17. Notably, appellants have conceded that, as Justice Department guidelines required, the Attorney General terminated the wiretap when Truong was indicted.

The absence of clear standards for defining or evaluating the "purpose" of a warrantless "national security" wiretap is hardly surprising in light of the fact that the more basic question–the existence of the foreign agent exception–had never been settled. Accordingly, appellants' allegations of prosecutorial purpose raise no genuine issue material to the Attorney General's right to immunity. Furthermore, it is not at all apparent that the existence of "prosecutorial purpose" should be determinative of the basic issue here–the reach of the warrant requirement in foreign agent cases. Official surveillance, whether its purpose be criminal investigation *or* intelligence gathering, risks infringement of constitutional interests. *See Keith*, 407 U.S. at 320, 92 S.Ct. at 2138. For this reason there may be no principled basis for the distinction appellants here urge.

ing surveillance directed at a criminal conspiracy, the Court held that proof that sixty percent of the intercepted calls were nonpertinent did not require a finding of inadequate minimization. *Id.* at 141–42, 98 S.Ct. at 1725. That the intercepted calls were very short, that they were "one–time only" calls, or that they were "ambiguous in nature or apparently involved guarded or coded language," were among the many reasons that might justify a "relatively high" percentage of nonpertinent calls; in such cases, agents could "hardly be expected to know that the calls [were] not pertinent prior to their termination." *Id.* at 140, 98 S.Ct. at 1725. Where an investigation is thought to focus on a widespread conspiracy, a commensurately widespread surveillance might be justified in an attempt to determine the precise scope of the enterprise. And the nature of the surveillance target's suspected role in the conspiracy is an essential factor in assessing the minimization required in the tap of his phone:

> For example, if the agents are permitted to tap a public telephone because one individual is thought to be placing bets over the phone, substantial doubts as to minimization may arise if the agents listen to every call which goes out over the phone regardless of who places the call. *On the other hand, if the phone is located in the residence of a person who is thought to be the head of a major drug ring, a contrary conclusion may be indicated.*

*Id.* (emphasis added).

■ We emphasize once more that our immunity inquiry does not focus on the actual reasonableness of the scope of the Truong surveillance. Nor does the record contain any facts that would enable us to do so. In opposing summary judgment appellants submitted no affidavits containing information as to the number, timing, frequency, or subject matter of their alleged conversations with Truong, information

presumably within appellants' personal knowledge. Their minimization arguments are couched in the broadest of terms— terms that merely parallel the allegations of their complaint that "[a]ll of [their] conversations with Mr. Truong over his telephone, during the period of [the] wiretap thereon, were intercepted." J.A. 7.[26] Without such facts there can be support neither for the contention that the Truong tap was inadequately minimized *as to appellants*, nor for the proposition that this alleged failure of minimization was in disregard of established law.

■ In this "atmosphere of confusion, ambiguity," and imminent change with regard to the law of foreign security surveillance, the Attorney General was entitled to consider a broad range of options in exercising the wide scope of discretion that his post entails; he was also obliged to "act swiftly and firmly at the risk that action deferred [would] be futile or constitute virtual abdication of office." *Scheuer v. Rhodes,* 416 U.S. at 246, 94 S.Ct. at 1691. We therefore decline appellants' invitation to engage in a *post hoc* usurpation of the legislative function by imposing liability on the Attorney General for failure to anticipate legislative reform. The conduct of foreign security surveillance was, whether by default or design, committed to the Attorney General's discretion in 1977–1978. Because he was required to act in a legislative vacuum and in the "absence of any generally accepted standard for testing the constitutionality" of foreign security wiretaps, *see Procunier v. Navarette,* 434 U.S. at 563, 98 S.Ct. at 860 (quoting *Procunier v. Martinez,* 416 U.S. 396, 407, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224 (1974)), we cannot hold that he acted with such disregard for established law that his conduct "cannot reasonably be characterized as being in good faith." *Wood v. Strickland,* 420 U.S. at 322, 95 S.Ct. at 1001.

---

**26.** The absence of any factual support for a minimization claim is particularly evident in the only affidavit submitted by appellants, that of counsel for Truong in the criminal trial. Although, as appellants inform us, Truong's counsel reviewed the surveillance transcripts, he was able to swear only that each appellant's conversations had been "intercepted . . . over a period of time commencing on or about May 11, 1977." J.A. 120.

#### 4. The Lack of Any Genuine Issue On Malice

Because the Truong surveillance violated no rights of appellants "clearly established" during the relevant period, the Attorney General was entitled to summary judgment on his immunity defense unless a genuine dispute existed as to whether he had "acted with 'malicious intention' to deprive [appellants] of a constitutional right or to cause [them] 'other injury.'" *Procunier v. Navarette*, 434 U.S. at 566, 98 S.Ct. at 862. This subjective element of the standard enunciated in *Wood v. Strickland, supra*, contemplates that the accused official intends the consequences of his conduct. *See Procunier v. Navarette*, 434 U.S. at 566, 98 S.Ct. at 862.

 In opposing summary judgment, appellants made no actual claim that the Attorney General acted with malicious motivations. Rather, the essence of each of their proffered disputes was a claim of mistake—that the Attorney General "knew or should have known" of the illegality of the Truong wiretap. We reject any suggestion that we can infer malice from any mistakes or errors of judgment that the Attorney General may have made with respect to matters not covered by "clearly established" law. A plaintiff must make "some showing" of malice to state a genuine issue as to the *bona fides* of the official's immunity defense. *Butz v. Economou*, 438 U.S. at 498, 98 S.Ct. at 2906. No such showing has been made here.[27]

The voluminous record in this case reveals neither evidence of malice nor a single fact from which an inference of malice could reasonably be drawn. The question of the Attorney General's state of mind was extensively developed in the record before the District Court. We are convinced, upon careful review of that record, that even granting all inferences and resolving all disputes in the appellants' favor, no reasonable person could infer that the Attorney General has acted with malicious intent. The record abounded with evidence of the Attorney General's actual belief that a warrant was not required for electronic surveillance of a foreign agent.[28]

Finally, the District Court had before it detailed and non-conclusory evidence that the Attorney General had acted on his own reasoned assessment of the necessary scope and duration of the surveillance. The Attorney General testified that, having explicitly considered the need to "minimize" or gather information by the least intrusive means possible, J.A. 65–67, 102–03, he had judged it necessary to intercept all calls on Truong's home telephone because, during the entire period of surveillance,

> I did not believe we had identified all of Truong's intelligence sources and contacts and we were not sure we knew the complete extent of SRV intelligence operations in this country.

J.A. 29. The Attorney General knew of the FBI investigation and was convinced that every effort was being made to minimize the required surveillance. J.A. 102.

---

27. In their complaint the appellants allege that the appellees intentionally and willfully violated appellants' constitutional and statutory rights. J.A. 10. The appellants also list as a genuine issue of fact whether the appellees believed the Truong wiretap to be legal. J.A. 123. We assume without deciding that these statements are sufficient to allege malice.

We note that a recent Supreme Court case, *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), holds that in a suit under 42 U.S.C. § 1983 (1976), brought against a public official, the plaintiff need not allege malice. Rather, the defendant must plead good faith as an affirmative defense. Even assuming that *Gomez*, which involved a statutory cause of action, is applicable to the present case, which involves a constitutional cause of action, we find that appellees have demonstrated in the record, without contradiction, that their actions were taken in good faith.

28. In 1973, then-Judge Bell authored *United States v. Brown, supra* note 17, a post–*Keith* case in which the Fifth Circuit reaffirmed its rule that an exception to the warrant requirement exists when the President authorizes surveillance of a foreign agent. *See also* J.A. 16, 21, 36–37, 72, 106–07. Judge Bryan, in the criminal case, found foreign intelligence to be the Attorney General's "primary, or even sole, purpose" in instituting the tap. *United States v. Humphrey*, 456 F.Supp. at 58.

What emerges here is an essentially uncontested picture of a high–level federal official required to act outside the zone of safely settled constitutional doctrine in a matter he viewed as posing an urgent threat to national security. His actions, if mistaken, conformed with prior presidential practice and had colorable claims to supporting judicial authority. In such an instance we accord immunity in order "to forestall an atmosphere of intimidation that would conflict with [his] designated functions in a principled fashion." *Ferri v. Ackerman*, 444 U.S. 193, 204, 100 S.Ct. 402, 409, 62 L.Ed.2d 355 (1979).

Our review of the record thus convinces us that, with regard to the one potential factual issue in this case, the Attorney General met the burden imposed on him by Rule 56(c), which requires the party moving for summary judgment "to show initially the absence of a genuine issue concerning any material fact," [29] granting all favorable inferences to the party opposing the motion. While the moving party's burden is a substantial one, the trial court must not interpret that burden so as effectively to preclude any possibility of summary judgment on an immunity claim. Yet appellants' argument, that allegations of intentional or reckless injury "cannot be disposed of on a motion for summary judgment," [30] invites this possibility. In view of the Supreme Court's injunction that damage suits against federal officials "need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity," *Butz v. Economou*, 438 U.S. at 508, 98 S.Ct. at 2911, a defendant's claim that the record supports no inference of his bad faith merits careful consideration. To hold that a governmental official cannot demonstrate the absence of a genuine issue as to malice on a motion for summary judgment would be to reduce the availability of summary judgment to situations in which plaintiff fails to allege malice. Such a rule would prevent the quick termination of insubstantial lawsuits against federal officials, as endorsed by the decision in *Butz*, and invite the very sort of "artful pleading" against which it cautioned. *Id.* at 507, 98 S.Ct. at 2911.

On the basis of the entire record before us, we hold that the District Court committed no error in rejecting any claim of malice.

## III. THE STAY OF DISCOVERY

Appellants argue that the District Court erred in granting the Attorney General's motion to stay discovery pending resolution of the dispositive motion on his immunity defense. The essence of this argument is that appellants' failure to "set forth specific facts showing that there is a genuine issue for trial," as required by Rule 56(e) of the Federal Rules of Civil Procedure, is attributable to the District Court's refusal to permit discovery in response to appellants' Rule 56(f) claim that discovery was necessary because facts essential to justify their opposition were in the Attorney General's

---

**29.** *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). *See Smith v. Nixon*, 606 F.2d at 1187. We are also required to consider, in light of appellants' failure to file counteraffidavits setting forth specific facts showing that there is a genuine issue for trial, as required by Rule 56(e), whether appellants have shown sufficient reasons, under Rule 56(f), why they could present no facts to justify their opposition to summary judgment. Rule 56 does not allow the party opposing summary judgment to create a dispute as to a material fact asserted in an affidavit simply by relying on the allegations of his complaint.

Plaintiffs must adduce, at the very least, some "specific facts from which a reasonable man, viewing all the evidence in the light most favorable to plaintiffs and resolving all testimonial conflicts in the same manner, could infer that the defendants were acting . . . in bad faith." *Halperin v. Kissinger*, 606 F.2d at 1209 n.119 (quoting *Askew v. Bloemker*, 548 F.2d 673, 679 (7th Cir. 1976)). Where such facts are entirely lacking, "plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits." *Butz v. Economou*, 438 U.S. at 508, 98 S.Ct. at 2911.

**30.** Appellants' brief, p. 35.

control. This argument suggests important and complex issues about the relation of a trial court's discretion to control discovery to the role of summary procedures in suits where official immunity is at issue. Fortunately, however, the difficulty in resolving appellants' claim in this factual and procedural context is not commensurate with the difficulties these interrelated issues might otherwise pose.

That the district courts are to accord great weight to the concept of relevancy in disposing of discovery motions was recently emphasized by the Supreme Court in *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979):

> [T]he discovery provisions, like all of the Federal Rules of Civil Procedure, are subject to the injunction of Rule 1 that they "be construed to secure the just, *speedy* and *inexpensive* determination of every action." To this end, the requirement of Rule 26(b)(1) that the material sought in discovery be "relevant" should be firmly applied, and the district courts should not neglect their power to restrict discovery where "justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . ." Rule 26(c). With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process.

*Id.* at 177, 99 S.Ct. at 1649 (emphasis in original).

■ In the case of suits against governmental officials, we are mindful that uncontrolled discovery in the course of "insubstantial lawsuits" can be a form of harassment that imposes an "undue burden" on the time and resources of public officials and their agencies. Therefore, as we have noted earlier, close control of discovery is "essential to the preservation of meaningful official immunity." *Halperin v. Kissinger*, 606 F.2d at 1209 n.120.

■ When appellants' claims to discovery are analyzed in light of these principles, it is evident that the District Court's grant of the stay was not, on this record, an abuse of discretion. Appellants' discovery request was designed to elicit documents relevant to their stated factual disputes, all of which, as we have explained, were immaterial to the immunity questions before the District Court. While appellants' alleged disputed issues may be perceived as statements of disagreement with the District Court's findings of law, they are not "factual" issues such as to preclude summary judgment. The District Court plainly had the authority to stay appellants' discovery request as not "relevant" to the question of law before it.

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the District Court. Whether or not the acts complained of here might be subject to different treatment under the Foreign Intelligence Surveillance Act is a matter that need not occupy us in this case. On the specific facts of this case, and in light of the law that existed at the time when the disputed surveillance took place, it must be found that the acts of the Attorney General were protected by the doctrine of qualified immunity. The judgment of the District Court is accordingly affirmed.

*So ordered.*