Morton H. HALPERIN, et al.,
Appellants,

v.

Henry A. KISSINGER, et al.

No. 84–5095.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 1, 1985.

Decided Dec. 5, 1986.

As Amended Dec. 5, 1986.

Mikva, Circuit Judge, filed concurring opinion in which Spottswood W. Robinson, III, Circuit Judge, joined.

Appeal from the United States District Court for the District of Columbia (Civil Action No. 1187–73).

Mark H. Lynch, with whom Susan W. Shaffer, Alan B. Morrison and John Cary Sims, Washington, D.C., were on the brief, for appellants.

Larry L. Gregg, Atty., U.S. Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., Barbara L. Herwig, Atty., Dept. of Justice, William D. Rogers and Bruce M. Chadwick, Washington, D.C., were on the brief, for appellees.

Before ROBINSON and MIKVA, Circuit Judges, and SCALIA,* Circuit Justice.

Opinion for the Court filed by Circuit Justice SCALIA.

Circuit Judge MIKVA filed a concurring opinion in which Circuit Judge ROBINSON joins.

SCALIA, Circuit Justice:

This is the first of three companion cases we decide today addressing application of

---

* Justice Scalia was a judge of this Court when this case was briefed and argued, and is a designated Circuit Justice of this Circuit on the date of this decision. *See* 28 U.S.C. §§ 42, 43(b) (1982).

the qualified immunity standard of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), to situations in which the challenged official claims to have been motivated by national security concerns. *See also Smith v. Nixon,* 807 F.2d 197 ("*Smith II*") (D.C.Cir.1986); *Ellsberg v. Mitchell,* 807 F.2d 204 (D.C.Cir.1986). Plaintiffs-appellants brought this damages action against federal executive officials for allegedly violating their constitutional and statutory rights in initiating and continuing for twenty-one months a warrantless wiretap of their private telephones. The District Court granted summary judgment to defendants on qualified immunity grounds, reasoning that the wiretap did not violate clearly established law since it had a rational nexus to national security. The central issue is what standard *Harlow,* which stripped the qualified immunity defense of its subjective element, prescribes on summary judgment where an asserted national security purpose is challenged as pretextual.

## I

A detailed factual background of this case is set out in this court's earlier opinion. *See Halperin v. Kissinger* ("*Halperin I*"), 606 F.2d 1192, 1195–99 (D.C.Cir. 1979), *aff'd in part by an equally divided Court, cert. dismissed in part,* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981). The challenged wiretap was purportedly part of a program designed by President Richard M. Nixon and several high level executive officials to stem what they perceived to be an alarming deluge of classified-information leaks to the press. The proximate impetus for the Halperin wiretap was a May 9, 1969 *New York Times* article reporting classified American bombing raids on Cambodia. *Raids in Cambodia by U.S. Go Unprotested,* N.Y. Times, May 9, 1969, at 1, col. 3. At Nixon's request, Henry A. Kissinger, then National Security Advisor, dispatched the Federal Bureau of Investigation ("FBI") to trace the source of the leak. FBI Director J. Edgar Hoover identified Morton H. Halperin, a National Security Council ("NSC") staff member, as the "prime suspect." To allay suspicions, Dr. Halperin acceded to Kissinger's suggestion that they curtail his access to sensitive information. In the meantime, Kissinger and Hoover had wiretaps installed (which then Attorney General John Mitchell approved shortly thereafter) on four private telephones, including the Halperin family's home telephone.

Kissinger ordered that the electronic surveillance continue in the face of FBI observations in May and June of 1969 that it was fruitless, and a July 8 FBI recommendation that it be terminated. It remained in place also despite Dr. Halperin's September 1969 resignation from the NSC staff, whereupon he continued only as a consultant with no access to classified information. Through most of the wiretap's first year, the FBI relayed written summaries of plaintiffs' telephone conversations to Nixon (through presidential aide John Ehrlichman) and Kissinger, and occasionally to Mitchell. In May 1970, Dr. Halperin resigned his consultant position. The wiretap continued—with the FBI summaries reported to H.R. Haldeman, Nixon's chief administrative aide—until February 10, 1971. While the FBI summaries reported much information of political significance to the Nixon Administration, at no point during its twenty-one month duration did any intercepted conversation implicate Dr. Halperin in any leak.

When the already-terminated Halperin wiretap came to light in connection with an unrelated criminal prosecution, *United States v. Russo & Ellsberg,* Crim. No. 9373 (WNB) (C.D.Cal. dismissed May 11, 1973), Dr. Halperin and his family brought an action for damages in the United States District Court for the District of Columbia against Nixon and nine federal officials. Plaintiffs alleged that the wiretap violated their rights under the fourth amendment's warrant and reasonableness requirements and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 197, 211 (current version

as amended by Title II of the Foreign Intelligence Surveillance Act of 1978, Pub.L. No. 95–511, 92 Stat. 1783, 1796, codified at 18 U.S.C. §§ 2510–2520 (1982)).

The District Court initially held Nixon, Mitchell, and Haldeman jointly liable for violating the fourth amendment's reasonableness requirement and granted summary judgment to the remaining defendants, *Halperin v. Kissinger*, 424 F.Supp. 838 (D.C.C.1976), but awarded only nominal damages, *Halperin v. Kissinger*, 434 F.Supp. 1193 (D.D.C.1977).

This court reversed, holding that the wiretap violated (1) Title III's procedural requirements for any period—to be determined by the District Court on remand—during which the wiretap's "primary purpose" was not the protection of national security, *Halperin I*, 606 F.2d at 1205, (2) the fourth amendment's reasonableness requirement for any period—also to be determined by the District Court—during which the wiretap's scope or duration was unreasonable, even though its primary purpose was the protection of national security, *id.* at 1206–07, and (3) the fourth amendment's warrant requirement, *id.* at 1206. On defendants' qualified immunity defense, we found "no basis for disturbing" the District Court's ruling that defendants were unshielded for any violation of the fourth amendment's clearly established reasonableness requirement, *id.* at 1210, but remanded to the District Court to decide whether defendants were shielded for violations of the fourth amendment's warrant requirement or Title III, *id.* at 1210 & n. 126. Finally, we reversed the grant of summary judgment to Kissinger. *Id.* at 1214.[1]

An equally divided Supreme Court affirmed without opinion as to all defendants except Haldeman, whose writ of certiorari was dismissed as improvidently granted. *Kissinger v. Halperin*, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981) .

While this case was on remand, the Supreme Court decided *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), which altered the qualified immunity defense to an objective inquiry. The District Court granted summary judgment in favor of all defendants, reasoning that since the wiretap had a "rational national security" basis, defendants were immune under *Harlow*. *Halperin v. Kissinger*, 578 F.Supp. 231, 234 (D.D.C.1984). Plaintiffs appeal, contending that defendants are not entitled to immunity because the putative national security justification is pretextual.

## II

The qualified immunity doctrine is an attempt to reconcile two important but conflicting concerns. On the one hand, "[i]n situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) (citing *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978), and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 410, 91 S.Ct. 1999, 2011, 29 L.Ed.2d 619 (1971)); *see Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984). On the other hand, such suits "frequently run against the innocent," burdening officials and chilling the conscientious execution of their duties. *Harlow*, 457 U.S. at 814, 102 S.Ct. at 2736; *see Gray v. Bell*, 712 F.2d 490, 496–97 (D.C.Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); *cf. Spalding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896).

As originally formulated, the qualified immunity defense had both objective and subjective elements. *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975); *see Butz v. Economou*,

---

1. We also affirmed the District Court's holding that Nixon was not entitled to absolute immunity. 606 F.2d at 1210–13. In light of the Supreme Court's intervening holding to the contrary in *Nixon v. Fitzgerald*, 457 U.S. 731, 755–57, 102 S.Ct. 2690, 2704–05, 73 L.Ed.2d 349 (1982), plaintiffs voluntarily dismissed the suit against Nixon.

438 U.S. at 507–08, 98 S.Ct. at 2911. The public official would be immune unless he "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury...." *Wood v. Strickland*, 420 U.S. at 322, 95 S.Ct. at 1000. In *Harlow*, the Supreme Court observed that the subjective elements of the defense—the requirements that the defendant not actually have known of the unconstitutionality of his action, and not have acted with malicious intention—"ha[d] proved [to be] incompatible with" the goal of prompt termination of vexatious litigation, *Harlow*, 457 U.S. at 815–16, 102 S.Ct. at 2736–37. It accordingly announced the elimination of those elements through adoption of a new objective test, whereby government officials performing discretionary functions were to be "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738 (citations omitted). The Court has since described *Harlow* as having "purged qualified immunity doctrine of its subjective components," *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2811, 86 L.Ed.2d 411 (1985), and as having "rejected the inquiry into state of mind in favor of a wholly objective standard," *Davis v. Scherer*, 468 U.S. at 191, 104 S.Ct. at 3018.

If these expansive descriptions were clearly correct, our task in the present case would be considerably simplified. The problem, however, is that whether (in the words of the *Harlow* test) "conduct does not violate clearly established ... rights," 457 U.S. at 818, 102 S.Ct. at 2738, often, if not invariably, depends upon the intent with which the conduct is performed. And it is impossible to place "[r]eliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law," *id.* (footnote omitted), when clearly established law makes the conduct legal or illegal depending upon the intent with which it is performed. That is precisely the situation here.

The legality of the Halperin wiretap under the statutory law that was then clearly established turns on its purpose. Title III, with exceptions not relevant here, *see* 18 U.S.C. § 2511(1), (2) (1976), required all electronic surveillance to comply with intricate approval and minimization requirements, *id.* §§ 2516, 2518–2519, and provided for a $100–per–day civil remedy for violations plus punitive damages and attorney's fees, *id.* § 2520. However, nothing in Title III "limit[ed] the constitutional power of the President ... to protect national security information against foreign intelligence activities." *Id.* § 2511(3). A wiretap legitimately directed to the protection of national security information from foreign intelligence activities, while it might have been unconstitutional, was at least exempted from (and *a fortiori* cannot have been clearly subject to) Title III's specific procedural requirements.[2] *Forsyth*, 105 S.Ct. at 2819 & n. 11; *United States v. United States District Court* ("*Keith*"), 407 U.S. 297, 306, 92 S.Ct. 2125, 2131, 32 L.Ed.2d 752 (1972); *see Halperin I*, 606 F.2d at 1204. Moreover, although we said in *Halperin I* that the claimed exemption for "protect[ion] [of] national security information against foreign intelligence activities" will be "closely scrutinize[d]" in the absence of a "direct link between the wiretap target and a foreign interest," 606 F.2d at 1204, if that is now clearly established law it was assuredly not so before we said it. It was surely reasonable to think that protecting national security information from unlawful public dissemination would constitute "protect[ion]

---

**2.** Title III furnishes a good faith defense that, for the purpose of this case, is identical to the pre-*Harlow* qualified immunity test. *Halperin I*, 606 F.2d at 1209 n. 115; *see* 18 U.S.C. § 2520. Since the defense under *Harlow* is the easier of the two to satisfy (Title III's defense being identical except for the additional subjective element) we need only address the defense under *Harlow*.

[of] national security information against foreign intelligence activities," since the principal purpose of prohibiting public dissemination is to keep such information from reaching foreign powers, and since one of the principal activities of foreign intelligence operatives is the collection of national security information from publicly available sources. Indeed, prior to our opinion in *Halperin I* it was reasonable to believe that protecting national security information from public dissemination would come within one of the other, more general, exemptions from Title III, such as that for "such measures as [the President] deems necessary to protect the Nation against . . . hostile acts of a foreign power," 18 U.S.C. § 2511(3) (1976).[3] In sum, the defendants would be entitled to immunity for their failure to comply with Title III if their activity had as a purpose the protection of national security information from disclosure.

 Purpose is also relevant to the qualified immunity defense to violation of the fourth amendment's warrant requirement. It is now clear that that requirement attaches to national security wiretaps that are not directed against foreign powers or suspected agents of foreign powers. *Halperin I*, 606 F.2d at 1206; *see Keith,*

407 U.S. at 321, 92 S.Ct. at 2138. But that was not clear at the time of the challenged wiretap, *compare Katz v. United States,* 389 U.S. 347, 359, 88 S.Ct. 507, 515, 19 L.Ed.2d 576 (1967); *Berger v. New York,* 388 U.S. 41, 50–53, 87 S.Ct. 1873, 1879–81, 18 L.Ed.2d 1040 (1967). Thus, the defendants would be entitled to immunity for their failure to obtain a warrant *if* their activity had a national security purpose. *Forsyth,* 105 S.Ct. at 2818.[4]

Since, therefore, the defendants' intent in performing their acts is crucial to the legitimacy of those acts under clearly established law, we are confronted with the problem of whether the expansive language of *Harlow, Forsyth,* and *Davis* is to be taken seriously. To give genuine effect to the Supreme Court's intimation in *Harlow* that it was instituting a new regime of "[r]eliance on the objective reasonableness of an official's conduct," 457 U.S. at 818, 102 S.Ct. at 2738, and that it was generally eliminating "[j]udicial inquiry into subjective motivation," *id.* at 817, 102 S.Ct. at 2737; and to validate the even more ambitious statements in *Forsyth* and *Davis* that the Court had "purged qualified immunity doctrine of its subjective components," 105 S.Ct. at 2811, and adopted a "wholly objective standard," 468 U.S. at 191, 104 S.Ct. at

---

3. Prior to the first appeal of this case the District Court found that "defendants' determination that Title III was inapplicable to the Halperin wiretap was reasonable during the period of surveillance." *Halperin v. Kissinger,* 424 F.Supp. at 842. We did not disapprove of that finding in *Halperin I,* but merely noted that it went to the existence of qualified immunity and not, as the District Court had applied it, to the applicability of Title III. 606 F.2d at 1204.

4. Here, as in the last sentence of the previous paragraph (dealing with immunity for violation of Title III), we advisedly state that merely *a* national security purpose was required, and not that that purpose must have been "primary." Opinions of both this and other courts have repudiated a "primary purpose" test for determining substantive legality of a putative national security wiretap under Title III and the fourth amendment. *See Zweibon v. Mitchell* ("*Zweibon IV*"), 720 F.2d 162, 173 n. 18 (D.C.Cir.1983), *cert. denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984); *Chagnon v. Bell,* 642 F.2d 1248, 1262 n. 25 (D.C.Cir.1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981);

*cf. United States v. Brown,* 484 F.2d 418, 426 (5th Cir.1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). These opinions conflict, however, with our statement in *Halperin I* that on remand "Title III will apply to any period during which the wiretap did not involve the *primary purpose* of protecting national security information against foreign intelligence activities," 606 F.2d at 1205 (emphasis added), and with statements in other cases, *see Zweibon v. Mitchell* ("*Zweibon III*"), 606 F.2d 1172, 1177 (D.C.Cir.1979) (dictum), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981); *cf. United States v. Butenko,* 494 F.2d 593, 606 (3d Cir.) (en banc) (purporting to apply primary-purpose test to case where sole purpose was foreign security), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974). We need not resolve the conflict here, because whether or not the primary-purpose test applies to the substantive legality of the wiretap, that requirement was assuredly not a *clearly established* one. *Chagnon,* 642 F.2d at 1262 n. 25.

3018; it would be necessary to preclude, for purposes of the qualified immunity determination, any inquiry into whether a requisite validating intent (*e.g.*, national security motivation) *in fact* existed. If the objective facts established grounds that would make such a motivation reasonable, the qualified immunity defense would attach; if not, it would fail.

It is, to say the least, unclear whether *Harlow* intended that result—or indeed whether it even had in mind the problem of legitimizing or illegitimizing intent *except insofar as intent is affected by the defendant's knowledge of the state of the law.* It is clear from the Court's opinion that the qualified immunity defense is not to be denied because the defendant official in fact knew (even though most people would not) that his action was categorically unlawful, or that it violated the plaintiff's rights because of the particular motive for which it was taken. This sort of *knowledge-related* malicious intention was what the facts of *Harlow* presented, and what the most explicit portions of the opinion specifically addressed, *see* 457 U.S. at 818–19, 102 S.Ct. at 2738. But it is not clear, unless one relies upon the less explicit and more generalized statements referred to earlier, that *Harlow* meant to eliminate inquiry into intent unrelated to knowledge of the law—for example, invalidating intent to discriminate on the basis of race, or (as in the present case) lack of validating intent to protect national security. Respectable argument can be made that it did so—in particular, the argument that the "objectification" of the qualified immunity defense, and the consequent early elimination of insubstantial claims, which was the announced purpose of *Harlow*, has simply not been achieved (not even *nearly* achieved) on any other hypothesis. One could also point to the fact that *Harlow* quotes Judge Gesell's earlier concurrence in the present case (a case that has prominent elements of intent unrelated to knowledge) in support of its new rule. 457 U.S. at 817 n. 29, 102 S.Ct. at 2738 n. 29.

It would not be a conclusive objection to such an interpretation that intentional in-

justices would be left without a civil damage remedy. That consequence is no different in *kind* from what *Harlow* unquestionably tolerates. Even interpreted most narrowly, as addressing only intent related to knowledge of the law, *Harlow* precludes monetary relief for a violation of constitutional rights by an officer who knows he is acting unlawfully, so long as the law enforcement community in general considers his conduct arguably proper. It cannot be disputed, however, that if intent unrelated to knowledge is also brought within *Harlow*'s proscription of inquiry, the *scope* of cases in which such a consequence will be produced would be vastly expanded. It is rare that a plaintiff's claim rests upon the defendant's subjective knowledge (despite uncertainty in the law) that what he did was unlawful; but common that it rests upon absence of a needful validating intent (as we have at issue here), and even more common that it rests upon presence of an invalidating intent unrelated to knowledge of the law (*e.g.*, racial or political antagonism).

The lower courts have been unwilling to rest such a massive expansion of official immunity upon the language of *Harlow* and later cases, without more specific indication that that was intended. No court, as far as we are aware, has extended *Harlow*'s proscription of subjective inquiry beyond the issue of knowledge of the law and intent related to knowledge of the law, except in a national security context. Though often unanalyzed, the approach has been that most clearly expressed by Judge Rubin in *Kenyatta v. Moore*, 744 F.2d 1179, 1185 (5th Cir.1984), *cert. denied*, 471 U.S. 1066, 105 S.Ct. 2141, 85 L.Ed.2d 498 (1985) (footnote omitted):

> Because the Court did not [in *Harlow*] purge substantive constitutional doctrine of all subjective issues, it did not entirely eliminate subjective inquiry from every qualified immunity analysis: some rights ... might be violated by actions undertaken for an impermissible purpose but not by the same actions undertaken for permissible purposes.

*See also Stathos v. Bowden,* 728 F.2d 15, 20 (1st Cir.1984); *McGee v. Hester,* 724 F.2d 89, 92 (8th Cir.1983).[5] This circuit has clearly aligned itself with that point of view. *See Hobson v. Wilson,* 737 F.2d 1, 27 & n. 79, 30–31 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *Briggs v. Goodwin,* 698 F.2d 486, 491–93, *vacated on other grounds,* 712 F.2d 1444 (D.C.Cir.1983).

We have not considered, however, nor to our knowledge has any other court of appeals, whether the objective principle of *Harlow* extends to the specific area of intent (unrelated to knowledge of the law) that consists of the validating intent to protect national security. Two district courts, however, including our own, have answered that question in the affirmative. *See Burkhart v. Saxbe,* 596 F.Supp. 96, 100 (E.D.Pa.1984); *Smith v. Nixon,* 582 F.Supp. 709, 714–15 (D.D.C.1984), *aff'd,* 807 F.2d 197 (D.C.Cir.1986); *Halperin v. Kissinger,* 578 F.Supp. 231, 234 (D.D.C.1984); *Ellsberg v. Mitchell,* Civ. No. 1879–72, slip. op. at 3 (D.D.C. July 22, 1983), *aff'd,* 807 F.2d 204 (D.C.Cir.1986). Following the broad language and rationale of *Harlow, Forsyth,* and *Davis* in that limited context would not vastly expand immunity, and there are solid reasons to believe that that would be faithful to the Court's intent. The separation-of-powers concerns that underlay *Harlow, see* 457 U.S. at 817 n. 28, 102 S.Ct. at 2737 n. 28, are especially prominent in the national security field. *See, e.g., Haig v. Agee,* 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981); *New York Times Co. v. United States,* 403 U.S. 713, 727, 91 S.Ct. 2140, 2148, 29 L.Ed.2d 822 (1971) (Stewart, J., concurring). And the harm produced by "dampen[ing] the ardor of [public officials] in the unflinching discharge of their duties," *Har-*

low, 457 U.S. at 814, 102 S.Ct. at 2736 (citation omitted), is particularly severe in the national security field, since "no governmental interest is more compelling," *Haig v. Agee,* 453 U.S. at 307, 101 S.Ct. at 2782 (citation omitted). Moreover, "broad-ranging discovery and ... deposing," *Harlow,* 457 U.S. at 817, 102 S.Ct. at 2737, is inordinately harmful in that field, since the need for secrecy is typically so great. In *Forsyth,* the Court rejected the claim of *absolute* immunity for officers performing national security functions on the assurance that they "will not [be left] at the mercy of litigants with frivolous and vexatious complaints," 105 S.Ct. at 2814, *because of the qualified immunity doctrine* —a doctrine that it described as "purged ... of ... subjective components," *id.* 105 S.Ct. at 2811. That assurance is vastly less secure if the description is erroneous even as to the basic subjective factor of whether the officer had a genuine national security motivation.

The concept of a special rule for national security matters is no stranger to court-made law—from reduced due process requirements, *see Haig v. Agee,* 453 U.S. at 309, 101 S.Ct. at 2783; *Cole v. Young,* 351 U.S. 536, 546–47, 76 S.Ct. 861, 868, 100 L.Ed. 1396 (1956), to increased ability to impinge upon interests protected by the first amendment, *see Snepp v. United States,* 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, n. 3, 62 L.Ed.2d 704 (1980), to authority (where foreign powers are involved) to conduct warrantless searches, *see United States v. Truong Dinh Hung,* 629 F.2d 908, 913–16 (4th Cir.1980).

Requiring national security validating intent to be determined on an objective basis would confer special treatment less expan-

---

5. *Egger v. Phillips,* 710 F.2d 292, 314–15 (7th Cir.), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983), contains language that could be interpreted to represent the contrary view, but the facts of that case, like those of *Harlow* itself, raised the issue of intent *related to knowledge of the law*—and, as in *Harlow,* it seems to be that element of intent that the court was addressing.

*Tubbesing v. Arnold,* 742 F.2d 401, 405 (8th Cir.1984), recites the principle that subjective intention is irrelevant, in apparent reference to intent *un* related to knowledge of the law; but it then proceeds, despite this recitation, to rely upon *lack of evidence* of invalidating intent in upholding summary judgment.

sive than the examples just mentioned since it would not alter the rules of conduct governing official action but merely the manner of proof in a damage action. In that regard it is closely analogous to the exception, in the national security context, to the general rule of executive amenability to judicial process, *see United States v. Nixon,* 418 U.S. 683, 706, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974). The so-called "state secrets privilege" applicable to national security matters sometimes "ma[kes] it impossible for [plaintiffs] to go forward with their claims for damages based on statutory and constitutional violations" because they cannot obtain "access to the facts." *Halkin v. Helms ("Halkin II"),* 690 F.2d 977, 990 (D.C.Cir.1982). In that context, the law "compels the subordination of the [plaintiffs'] interest in the pursuit of their claims to the executive's duty to preserve our national security." *Id.* at 1001. *See also Molerio v. FBI,* 749 F.2d 815, 822 (D.C.Cir.1984); *Ellsberg v. Mitchell,* 709 F.2d at 57–58. The availability of that privilege, like the availability of the qualified immunity defense urged here, is determined on the basis of objective criteria. The courts do not inquire whether the real motivation for claiming the privilege is national security, but accept the assertion of privilege, without so much as an *in camera* inquiry into its basis, if they are satisfied "from all the circumstances of the case, that there is a reasonable danger that

compulsion of the evidence will expose ... matters which, in the interest of national security, should not be divulged." *United States v. Reynolds,* 345 U.S. 1, 10, 73 S.Ct. 528, 533, 97 L.Ed. 727 (1953).

■ While the state secrets privilege protects primarily the *content* of national security information, and the qualified immunity defense primarily the *process* of national security decision-making, in our view the latter is equally worthy of special protection, which *Harlow* was meant to provide. Accordingly, at least where, as here, the officials claiming immunity purported at the time they engaged in the challenged conduct to have been motivated by national security concerns, a purely objective inquiry into the pretextuality of the purpose is appropriate. That is to say, if the facts establish that the purported national security motivation would have been reasonable, the immunity defense will prevail.[6]

### III

■ The District Court granted summary judgment because the "objective record ... reflecte[d] a rational national security concern." 578 F.Supp. at 234.[7] That is not enough, however, to entitle defendants to summary judgment. As we have discussed above, *Harlow,* as applied to the national security context, changed the substance of

---

6. Contrary to appellants' argument, the Supreme Court's opinion in *Forsyth* does not preclude such a result. There the Court held that summary judgment was appropriate because it could infer that the district court had already found the challenged wiretap to have had a national security purpose. *See Forsyth,* 105 S.Ct. at 2820 n. 13. If it at all focused on the manner in which the district court made that finding (which is unlikely), it may well have regarded the district court's determination as the application of an objective reasonableness test. But even if it did not, its direction to enter summary judgment reveals nothing about its opinion as to the propriety of a subjective rather than objective inquiry. If the district court had found that a national security purpose would not only have been reasonable but in fact existed (the composite "knew *or reasonably should have known*" test of *Strickland,* 420 U.S. at 322, 95 S.Ct. at 100 (emphasis added), would require

objective reasonableness *in addition* to subjective intent), a remand to redecide the issue on the basis of objective reasonableness alone would have been pointless.

7. While the court's analysis is not pellucid, a companion case illuminates what appears to be its reasoning: "At the very least it can be said that *Harlow* renders certain facts no longer 'material' within the meaning of Rule 56: 'subjective motivation' and 'intention' are of no legal significance after *Harlow* and may not be the subject of inquiry." *Smith v. Nixon,* 582 F.Supp. at 715; *see also Burkhart v. Saxbe,* 596 F.Supp. at 100; *Ellsberg v. Mitchell,* Civ. No. 1879–72, slip op. at 3 (D.D.C. July 22, 1983). To the extent that this statement purports to cover contexts that do not implicate national security, the prior decisions of this court, as discussed above, require that it be rejected.

the qualified immunity defense—what is *material* to the defense—to a wholly objective inquiry. It did not, however, alter the burden that Rule 56(c) of the Federal Rules of Civil Procedure places on the movant to demonstrate, as a condition of summary judgment, that the objective inquiry raises "no genuine issue as to any material fact...." Fed.R.Civ.P. 56(e). *Briggs v. Goodwin*, 698 F.2d 486, 489 n. 2, *vacated on other grounds*, 712 F.2d 1444 (D.C.Cir. 1983); *McSurely v. McClellan*, 697 F.2d 309, 320–21 (D.C.Cir.1982); *see Hobson v. Wilson*, 737 F.2d 1, 25–27 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 83 L.Ed.2d 142 (1985); *cf. National Black Police Association, Inc. v. Velde*, 712 F.2d 569, 573–74 (D.C.Cir.1983) (applying usual summary judgment rules after observing "*Harlow* substantially altered the standards governing motions for summary judgment in cases involving claims of qualified immunity"), *cert. denied*, 466 U.S. 963, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984). A straightforward application of Rule 56(c) to the objective national security inquiry, as we have described it above, requires (at least in a case where it is uncontested that the defendants purported to be acting for national security reasons) that defendants adduce sufficient facts that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendants to be acting for national security reasons.

Contrary to defendants' arguments, *see* Brief for Appellees at 23–24, application of summary judgment rules to the objective test is entirely consistent with this court's decisions in *Zweibon IV*, 720 F.2d 162 (D.C. Cir.1983), *cert. denied*, 469 U.S. 880, 105 S.Ct. 557, 83 L.Ed.2d 182 (1984), and *Chagnon v. Bell*, 642 F.2d 1248 (D.C.Cir.1980), *cert. denied*, 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 694 (1981). In *Chagnon*, we rejected the argument "that a warrant is required for a foreign security surveillance for any period in which the Government's '*primary* purpose' is 'prosecutorial.'" *Chagnon*, 642 F.2d at 1262 n. 25 (emphasis

added). We reasoned that because of "[t]he absence of clear standards for defining or evaluating the 'purpose' of a warrantless 'national security' wiretap ... [the plaintiffs'] allegations of prosecutorial purpose raise no genuine issue material to the Attorney General's right to immunity." *Id.* That statement addressed *only* the argument that a wiretap indisputably based on objectively reasonable national security grounds, *see* Brief for Appellees at 25 n. 22, might nevertheless have violated clearly established law because its *primary* purpose was not the protection of national security. "[C]lear standards" of official conduct were lacking, not with regard to the validating effect *vel non* of an objectively reasonable national security purpose, but with regard to the alleged necessity that that validating purpose *predominate* over the impermissible. Thus, proof that the national security purpose predominated was unnecessary, and disagreement over facts pertaining to that issue was not a disagreement concerning "material" facts. That says and implies nothing concerning the materiality of facts pertaining to the objective reasonableness of a national security purpose. We went to great lengths in *Chagnon* to distinguish factual situations (including this case) "involving the incantation of the foreign security shield by governmental defendants where substantial question as to the pretextuality of the claim exists." *Chagnon*, 642 F.2d at 1260–61 (citing *Smith v. Nixon* ("*Smith I*"), 606 F.2d 1183, 1188 (D.C.Cir. 1979), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981), and *Halperin I*, 606 F.2d at 1204–05).

In *Zweibon IV* we simply reiterated *Chagnon* to reject the plaintiffs' contention that because the putative domestic security wiretap constituted "'"a good faith" surveillance undertaken *primarily* for prosecutorial purposes, [the defendant] violated "clearly established" law.'" 720 F.2d at 173 n. 18 (quoting *Zweibon IV*, Brief for Appellants at 56) (emphasis added and original emphasis deleted). As in *Chagnon*, there was no dispute, and we never ques-

tioned, that *a* national security purpose—"to forestall deterioration in American-Soviet relations and to avoid threatened retaliation against American citizens in Russia," 720 F.2d at 164—had been manifested and was objectively reasonable. Both *Zweibon IV* and *Chagnon* stand for no more than the proposition that a *bona fide* national security wiretap is not transformed merely because its fruits might also be desired for other purposes. *See also Sinclair v. Kleindienst*, 645 F.2d 1080, 1085 (D.C.Cir. 1981).

We turn, then, to application of the summary judgment standard to, first, the initiation and, then, the duration and scope of the wiretap.

### A

The District Court, believing it irrelevant whether Dr. Halperin had access to information that was *actually* leaked, J.A. 230–31, based its summary judgment of qualified immunity on the uncontested observation that Dr. Halperin "was exposed to [classified] national security information while on the NSC staff." 578 F.Supp. at 234. That scintilla of evidence, while it might suffice to demonstrate a "rational national security concern," *id.*, is far from the quantum of evidence that would compel *every* reasonable jury to conclude that the decision to initiate a wiretap on national security grounds was objectively reasonable.

■ When we first considered this case, Dr. Halperin had admitted having learned of the bombing of North Vietnamese sanctuaries in Cambodia "soon after the bombing began, probably in March 1969," Plaintiffs' Answers to Defendants' Second Interrogatories, No. 10 (Mar. 31, 1976), and that he might have had access to limited planning papers concerning the withdrawal of troops from North Vietnam, Deposition of

M. Halperin at 184. The evidence also reflected that those who initiated the wiretap knew that Dr. Halperin had roomed with the reporter who wrote the May 9, 1969 story, that he failed to report stops in Greece, Yugoslavia, and the Soviet Union when filling out a 1966 Department of Defense form, and that he misidentified a Russian national with whom he lunched in 1967. *Halperin I*, 606 F.2d at 1196 n. 15. We ventured no opinion as to whether that evidence justified the initiation of a national security wiretap, *id.* at 1205, or (if not) whether the initiation of the wiretap violated clearly established law, *id.* at 1210. Instead, we remanded, directing the District Court to consider also the subjective evidence that, according to plaintiffs, suggested that Dr. Halperin was initially targeted in order to bolster within the Nixon Administration the political credibility of Kissinger's staff appointments. *Id.* at 1205.[8] Whatever relevance such evidence may have had to our pre-*Harlow* consideration of this case, subjective evidence suggesting that defendants could have had (or actually did have) motives other than national security is now irrelevant to the objective reasonableness of the contemporaneously expressed national security motivation.

■ Since the first appeal, however, further information has surfaced bearing on the objective reasonableness of the national security purpose. Upon production of accumulated work-related documents that Dr. Halperin had deposited with the National Archives, Dr. Halperin admitted that "[t]he documents ... demonstrate that [he] had access to option papers discussing the possibility of [a Cambodia bombing operation, secret talks with the North Vietnamese, and the withdrawal of troops from Vietnam], as well as contingency planning in the event these steps might be taken." J.A. 220. Further, plaintiffs have not denied that Dr. Halperin had advance knowl-

---

8. The evidence included letters from Senator Goldwater to Nixon and Mitchell recommending Dr. Halperin's ouster, and Kissinger's apparent directive on June 4, 1969 to continue the surveillance to establish "'a pattern of innocence,'" *Halperin I*, 606 F.2d at 1205 (quoting Memorandum from A. Haig to H.A. Kissinger (June 4, 1969)). *See also id.* at 1205 n. 82 (citing House Judiciary Committee report, which "squarely concluded that the May 1969 wiretaps, including Halperin's, were established for 'political purposes'") (citation omitted).

edge of the decision to alter the Administration's negotiating strategy regarding the reversion of Okinawa to Japanese control, which was also leaked to and reported by the press. *See* Brief for Appellees at 10 n. 10, 30 n. 30; *see also Smith II*, 807 F.2d at 199.

Plaintiffs argue that summary judgment is inappropriate because Dr. Halperin "vigorously asserts," Brief for Appellants at 20 n.* (citing J.A. 220), that he "did not have prior access to the *details* of the Cambodian bombing operation which were revealed in the *New York Times* on May 9, 1969," J.A. 220 (emphasis added). Even if this is so, it does not undercut the force of Halperin's admission that he had nearly unique access to what was (in light of the United States' agreement with Prince Sihanouk of Cambodia, *see* Nixon Deposition at 22, 32–34) the single most damaging detail that was leaked. On the basis of the evidence, a reasonable jury might disagree with the decision to tap plaintiffs' telephone. But no reasonable jury could fail to find that there were reasonable national security grounds for such a wiretap. Summary judgment as to the initiation of the wiretap was therefore proper.

### B

While defendants are entitled to immunity for their initiation of the wiretap, plaintiffs contend that immunity does not attach to the allegedly illegal duration and scope of the wiretap under Title III and the fourth amendment's reasonableness requirement.

■ We have already held that "Title III will apply to any period during which the wiretap did not involve the primary purpose of protecting national security information against foreign intelligence activities."[9] *Halperin I,* 606 F.2d at 1205. When this case was before us earlier, we observed that there was "little evidence before us for classifying the surveillance from May 1970 [when the wiretap had al-

ready been in effect for one year with no product bearing upon national security concerns, and when Halperin resigned his position as consultant to the National Security Council] to February 1971 as a national security action not reached by Title III." *Id.* at 1204. Defendants introduced no new evidence pertaining to that period on remand—and their brief here, which dwells almost exclusively on the initiation of the wiretap, is conspicuously silent as to its continuation. It is true that since our earlier evaluation new evidence has been introduced augmenting the grounds for *initial* suspicion of Halperin—and presumably the greater the initial suspicion the longer a wiretap may be justified to establish that the suspicion is unfounded. Even so, we think it impossible to find that no reasonable jury could conclude that continuation of the wiretap after May 1970 was objectively unreasonable. Summary judgment with regard to that period is therefore not permissible. We leave it to the District Court to determine, on remand, the period prior to May 1970 for which the summary judgment standard we have described above could be met.

■ As to that period during which every reasonable juror would agree that the initially rational national security concern continued to justify the wiretap, defendants were still obliged to comply with both the reasonableness and the warrant requirements of the fourth amendment. *Halperin I,* 606 F.2d at 1205. We must determine whether the claims based on these requirements are subject to the qualified immunity defense. As to the warrant requirement, the answer is plain, since it was not yet clearly established. *See Forsyth,* 105 S.Ct. at 2818. We need only consider fourth amendment reasonableness, which goes to the duration and scope of the wiretaps (including, perhaps, minimization of use of the information obtained).

**9.** Since qualified immunity turns only on whether every reasonable jury would find that a national security justification was reasonable, we need not resolve the apparent contradiction with cases that reject primary purpose as the standard on the merits. *See supra* note 4.

In *Halperin I* we said, with apparent reference to all fourth amendment elements:

The District Court also applied the objective standard, finding that the defendants violated the Fourth Amendment, and, "[l]ike any other citizen, these officials are charged with knowledge of established law and must be held accountable for personal misconduct."

We find no basis for disturbing these rulings. Certainly there were no reasonable grounds for believing that the continuing surveillance was in accord with the Constitution....

606 F.2d at 1210 (footnote omitted). The judgment of this panel is that, for reasons stated in the concurrence, we are bound by those words. Since, however, I disagree with the majority on this point, I pause briefly to set forth the basis of my disagreement. *Halperin I* was decided pre-*Harlow*, and the fourth amendment issue was therefore addressed in a context in which, even if the defendants' acts *had* been objectively reasonable, a genuine issue of fact regarding the defendants' *subjective* intent would have precluded summary judgment on the qualified immunity defense. And as we pointed out in our discussion, summary judgment "[o]n the subjective criterion" would ordinarily "be more difficult." *Id.* at 1209. It was the subjective criterion that we discussed first, and on that element alone found the presence of a genuine issue of material fact indisputable. That being so, our discussion of the objective criterion was superfluous, which is perhaps why it consisted of virtually an *ipse dixit* ("We find no basis for disturbing these rulings. Certainly there were no reasonable grounds for believing that the continuing surveillance was in accord with the Constitution...."), with no detailed analysis of the state of the law at the relevant time. *Id.* at 1210.

The state of that law was, however, more intensively perused in our post-*Harlow* cases, and the clear and unequivocal summary of their conclusion is as follows:

We ... acknowledged in *Sinclair* [*v. Kleindienst*, 645 F.2d 1080 (D.C.Cir. 1981),] that there "was no judicially imposed reasonableness requirement for national security wiretaps [in 1969–71]," *id.* at 1082, and that the minimization procedures Mitchell himself had prescribed ... "pre-dated any judicial requirement for them in national security surveillance." 645 F.2d at 1085. Similarly, in *Chagnon v. Bell*, [642 F.2d at 1262 (involving a wiretap conducted in 1977–78)], we noted that even in its 1972 *Keith* opinion the Supreme Court had "declined to delineate 'precise standards for domestic security warrants'" and instead had invited Congress to articulate them.... *It is plain, therefore, that there existed no clearly established warrant or reasonableness requirements at the time Mitchell authorized the JDL surveillance [in 1970–71].*

*Zweibon IV*, 720 F.2d at 169–70 (citations omitted) (emphasis added). It is significant that *Zweibon IV*, *Chagnon*, and *Sinclair* all felt it unnecessary to distinguish *Halperin I*'s contradictory assertion, as would have been required if it were regarded as the law of this circuit.

We have acknowledged in the past that "the law of the case 'is not an inexorable command that rigidly binds a court to its former decisions but rather is an expression of good sense and wise judicial practice.'" *Melong v. Micronesian Claims Commission*, 643 F.2d 10, 17 (D.C.Cir.1980) (quoting *Carpa v. Ward Foods, Inc.*, 567 F.2d 1316, 1320 (5th Cir.1978)); *see Safir v. Dole*, 718 F.2d 475, 481 n. 3 (D.C.Cir.1983) ("Application of the doctrine is in any event discretionary....") (citation omitted), *cert. denied*, 467 U.S. 1200, 104 S.Ct. 3563, 82 L.Ed.2d 864 (1984). It seems to me that the alternative and hence unnecessary character of an original pronouncement, its lack of substantial analysis, and its incompatibility with later, more carefully considered, holdings justify a departure from the usual principles of law of the case. Moreover, it is difficult to envision how the District Court is to implement the majority's directive that it apply this portion of

*Halperin I.* In order to dispose of the case, the District Court must identify those particular actions of the defendants that violated—*not* what were at the time clearly established standards of the fourth amendment in the national security context (because we know from our later cases that there were *no* such clearly established standards)—but rather, what the *Halperin I* court erroneously thought to be the then clearly established standards. The majority directs the District Court to engage in this psychoanalysis with no guidance except *Halperin I*'s conclusory statement that "there were no reasonable grounds for believing" the wiretap had satisfied the then clearly established standards it had in mind. 606 F.2d at 1210.[10] Our review of the District Court's judgment on appeal (which is a virtual certainty in this fourteen-year litigation) will presumably be based upon a similar psychoanalysis. Rather than confront that imaginative task, the " 'good sense and wise judicial prac-

tice' " that informs the law-of-the-case doctrine, *Melong,* 643 F.2d at 17 (citation omitted), would compel me to hold, in accordance with our later cases, and with the Fourth Circuit's opinion in *United States v. Truong Dinh Hung,* 629 F.2d 908, 916–17 (4th Cir.1980); *see also Burkhart v. Saxbe,* 596 F.Supp. 96, 102 (E.D.Pa.1984) (dictum), that at the time here in question the reasonableness requirements of the fourth amendment were not clearly established in the national security context.[11]

### IV

Each defendant also claims absolute immunity, both derivatively from his position as a key presidential aide, and functionally because he was discharging a special "function so sensitive as to require a total shield from liability," *Harlow,* 457 U.S. at 813, 102 S.Ct. at 2735. The Supreme Court has repeatedly held that sta-

---

**10.** The concurrence suggests that guidance can be derived from examination of the cases cited by the *Halperin I district* court. *See Halperin,* 424 F.Supp. at 843 (citing *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *Osborn v. United States,* 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966)). Two of the three cases cited, however, do not deal with wiretapping, at all, *Katz,* 389 U.S. at 348, 88 S.Ct. at 509; *Osborn,* 388 U.S. at 325–26, 87 S.Ct. at 430–31, not a single one of them arises in the national security context, and the most recent of them specifically left open what fourth amendment reasonableness entailed in the national security context, *Katz,* 389 U.S. at 358 n. 23, 88 S.Ct. at 515 n. 23. *See also Keith,* 407 U.S. at 322–23, 92 S.Ct. at 2139.

**11.** The concurrence accuses me, in adopting this resolution, of "playing pick and choose among the cases precedent." Concurrence at 5. Leaving oneself open to that charge is, of course, an inevitable consequence of following the well-established rule that law of the case is not an inflexible doctrine. The concurrence is inaccurate, however, to portray the choice before us as merely one between two conflicting analyses in our circuit case-law, both of which are equivalently authoritative. Were that so, I would assuredly follow the analysis previously announced in the present case. But, as plaintiffs themselves at one time acknowledged to this court, *Zweibon IV,* being the more recent opinion, *is the law of this circuit,* so that the choice

is between following that law or adhering to the erroneous view expressed in *Halperin I. See* Appellants' Opposition to Appellees' Motion for Summary Affirmance at 2 (filed Apr. 6, 1984) ("*Zweibon IV, Sinclair,* and *Chagnon* held that the reasonableness requirement was not clearly established."); *id.* at 3 n.*, 8 (because law of circuit contrary to *Halperin I* reversal would require *en banc* review). If there is any risk of "playing pick and choose" created by the opinions in this case, I suggest it is to be found in the concurrence's novel proposition that when a panel opinion (*Zweibon IV* ) contradicts an earlier panel opinion (*Halperin I* ) the later opinion does not control, but rather merely "renders the current law of the circuit unclear," Concurrence at 4, leaving later panels free to go either way. That proposition leaves the law of this circuit in confusion, not merely with respect to the present issue of fourth amendment reasonableness, but with respect to many other fields as well. *See, e.g., Riegle v. Federal Open Market Committee,* 656 F.2d 873, 879 & n. 7 (D.C.Cir.) (finding congressional standing by attempting to distinguish *Reuss v. Balles,* 584 F.2d 461, 465–68 (D.C.Cir.), *cert. denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978), which found none in identical circumstances), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981); *Harrington v. Bush,* 553 F.2d 190, 207–09 (D.C.Cir.1977) (abandoning holding of *Mitchell v. Laird,* 488 F.2d 611, 614 (D.C.Cir.1973), that allowed for congressional standing whenever alleged illegality "bears upon" Congress' impeachment power).

tus as a Cabinet member or high official does not alone entitle an official to absolute immunity. *Forsyth*, 105 S.Ct. at 2813; *Harlow*, 457 U.S. at 809–11, 102 S.Ct. at 2733–34. In *Forsyth*, 105 S.Ct. at 2813–14, the Court also squarely rejected national security as a basis for functional absolute immunity of the Attorney General. The defendants' attempts to distinguish these holdings are readily rejected.

If performance of a national security *function* does not entitle the Attorney General to absolute immunity, then the fact that the National Security Advisor's *"entire* function is defined by the interrelated concepts of national security and foreign policy," Appellees' Supplemental Memorandum at 11–12 (citation omitted) (emphasis added), can hardly justify the conferral of absolute immunity upon that office as such, as counsel for Kissinger would urge. Mitchell and Haldeman, for their part, argue that they are entitled to absolute immunity because of (respectively) the Attorney General's "central legal functions," *see* Appellees' Supplemental Memorandum at 11, and the Chief of Staff's "critical role ... in the functioning of the modern Presidency," *id.* at 11–12. But those arguments simply restate defendants' job titles. The functions of both offices display the same characteristics described by the Supreme Court in rejecting absolute immunity for the Attorney General in *Forsyth*, *see* 105 S.Ct. at 2813–14. Especially in light of the additional protection afforded by the objective test in the national security context, qualified immunity adequately protects those positions from undue interference.

\* \* \* \* \* \*

We affirm the District Court's grant of summary judgment to defendants as to the initiation of the wiretap, but remand to the District Court to determine, in accordance with this opinion, the period (beginning with the wiretap's initiation and ending no later than May 1970) during which no reasonable jury could find the wiretap's putative national security purpose objectively unreasonable. As to that period, summary judgment against plaintiffs will lie on the Title III claim, and as to the period thereafter the case may proceed to trial on the Title III claim. The period for which summary judgment is granted on the Title III claim is still subject to the fourth amendment reasonableness requirement. The District Court must determine the portion of that period for which defendants are entitled to summary judgment on the fourth amendment reasonableness claim because no reasonable jury could find that the wiretap violated what the *Halperin I* court found to have been the clearly established reasonableness standards. Of course, any claim that survives summary judgment will still be subject to an assertion of qualified immunity based upon evidence adduced at trial.

*So ordered.*

MIKVA, Circuit Judge, with whom ROBINSON, Circuit Judge, joins, concurring:

Among the issues we must decide in this case is whether the qualified immunity defense shields the appellees from the appellants' fourth amendment reasonableness claim. We hold that the defense does not shield the appellees from this claim, because *Halperin I* already decided that the reasonableness requirement was clearly established, and we decline to depart from the law of the case.

Notwithstanding Justice Scalia's suggestion to the contrary, *Halperin I* unambiguously held that the fourth amendment reasonableness requirement was clearly established with respect to national security wiretaps in 1969. The district court decision on review in that case had stated that the scope and duration of the Halperin wiretap represented the "antithesis of the 'particular, precise, and discriminate' procedures required by the Supreme Court in numerous Fourth Amendment cases." 424 F.Supp. at 843 (citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *Osborn v. United States*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966)). The *Halperin I* decision explicitly approved

the district court's finding that the defendants had violated clearly established fourth amendment law, explaining that "there were no reasonable grounds for believing that the continuing surveillance was in accord with the Constitution...." Of course, *Halperin I* also upheld the district court's finding that the defendants had acted in bad faith. But there is no basis for suggesting (as Justice Scalia appears to do) that the court's decision as to the subjective aspect of the pre-*Harlow* immunity defense transformed its decision as to the objective aspect of that defense into a superfluity entitled to little weight. Under no plausible reading of the *Halperin I* decision can it be said that the court relied more heavily on the subjective than on the objective finding. And the mere fact that a holding is in the alternative does not render it any less a holding. The law of the case is that the fourth amendment reasonableness requirement was clearly established and that the defendants violated it.

Courts, of course, need not always adhere to the law of the case. In certain circumstances, law of the case rules will give way, and courts will reconsider matters once decided during the course of a lawsuit. The most common and most widely accepted formulation of the scope of the law of the case doctrine comes from *White v. Murtha*, 377 F.2d 428 (5th Cir.1967), in which the court stated that the law of the case

> must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.

*Id.* at 431–32 (cited in *Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 1391 n. 8, 75 L.Ed.2d 318 (1983); *Melong v. Micronesian Claims Commission,* 643 F.2d 10, 17 (D.C.Cir.1980)). The question thus becomes whether any of the three major grounds justifying reconsideration

exists in this case. An examination of the relevant law and facts convinces us that none of these grounds in fact appear.

The primary dispute arising from application of the *Murtha* test to this case concerns the "intervening law" branch of that test. No one has seriously argued that the evidence presented by the defendants in their second trial is sufficient to allow this court to disregard the law of the case. Similarly, no one appears to claim that this case presents any of the "truly 'exceptional circumstances,'" *Laffey v. Northwest Airlines, Inc.,* 740 F.2d 1071, 1082 (D.C.Cir. 1984), that courts must find in order to depart from the law of the case on the ground of clear error and manifest injustice. Instead, appellees claim (and Justice Scalia agrees) that subsequent decisions by other panels of this court compel reconsideration of the reasonableness issue. We reject this contention.

As an initial matter, the intervening law of which *Murtha* speaks primarily means law deriving from statute or a higher court. *See* 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction § 5023 (1981). Although courts have often departed from the law of the case as a result of an amendment of a statute, *see, e.g., Amen v. City of Dearborn,* 718 F.2d 789, 793–94 (6th Cir.1983), or a decision of a higher court, *see, e.g., Crane Co. v. American Standard, Inc.,* 603 F.2d 244, 248–49 (2d Cir.1979), only one court of which we are aware has departed from the law of the case because of an intervening decision of the same or similar court, *see Doe v. Anrig,* 728 F.2d 30, 31 (1st Cir.1984).

Second, even assuming that a court may under certain circumstances depart from the law of the case because of an intervening decision by a different panel of the same court, this case is not one in which to take that step. Appellees rest their argument on three intervening decisions of this court, but none of those cases is on all fours with the case *sub judice* and none offers a sufficiently cogent and overarch-

ing analysis of the reasonableness issue to control this case. In *Chagnon v. Bell*, 642 F.2d 1248 (D.C.Cir.1980), the court primarily concerned itself with the fourth amendment's warrant requirement, *see id.* at 1258–61; its only conclusion regarding the amendment's reasonableness requirement was that the absence of sophisticated minimization techniques in the context of a foreign agent surveillance did not violate clearly established law, *see id.* at 1262–63. This holding is hardly irreconcilable with the holding in *Halperin I.* In *Sinclair v. Kleindienst*, 645 F.2d 1080 (D.C.Cir.1981), this court did indeed state that "there was no judicially imposed reasonableness requirement for national security wiretaps at the time," *id.* at 1082, and that the minimization techniques that Attorney General Mitchell prescribed "predated any judicial requirement for them in national security surveillance," *id.* at 1085. These statements, however, comprise the court's *entire* discussion of the fourth amendment's reasonableness requirement, and they arose in a context that is wholly different from that of this case. The *Sinclair* Court was at no time called upon to decide whether the reasonableness requirement was clearly established; the first statement quoted above appears in the court's statement of the case and the second appears in the court's discussion of whether Mitchell acted in bad faith in failing to seek a warrant. Such statements cannot properly lead this court to depart from the law of the case. Finally, in *Zweibon v. Mitchell* (*"Zweibon IV"*), 720 F.2d 162 (D.C.Cir. 1983), *cert. denied*, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984), the court did no more than quote the statements in *Sinclair* and conclude that "[i]t is plain, therefore, that there existed no clearly established warrant or reasonableness requirements at the time Mitchell authorized the JDL surveillance [in 1970–71]." To the extent that Justice Scalia suggests that this holding is any less conclusory than the holding in *Halperin I*, he is simply incorrect. (Compare *Doe v. Anrig*, 728 F.2d at 31, in which the court departed from the law of the case because of an intervening decision by an-

other panel that detailed fully and precisely the reasons for overturning prior law.) The *Zweibon IV* holding certainly renders the current law of the circuit unclear, but it is insufficient to make this court depart from the long-established and sensible rule of the law of the case.

We therefore follow the panel in *Halperin I* and remand to the district court to determine the precise period in which the wiretap violated *Halperin I*'s view of clearly established fourth amendment reasonableness doctrine. If but only if, any part of this period falls outside the period in which the remedies of Title III apply, the constitutional remedy will come into play.

Justice Scalia suggests that in so remanding, we give the district court an impossible task; according to Justice Scalia, the district court will have to "psychoanaly[ze]," with little or no guidance, the judges who composed the *Halperin I* court. We think this characterization of the district court's task overdramatic and incorrect. The court need do no more than go back to the principles and cases cited by the district court and approved by the circuit court in *Halperin I* in order to perform its duty. The far greater worry than that the district court will have to "psychoanalyze" the *Halperin I* court is that future litigants before this court will have to "psychoanalyze" individual judges in order to determine whether they will apply the law that they should apply—the law that has already been argued and decided in the case before the court.

Courts are never comfortable when they have to choose between conflicting analyses of legal questions offered by different configurations of the jurists who compose a court. Such conflicts are baffling to the parties and embarrassing for the court. We will never be wholly free of such conflicts: hard questions and large courts make their avoidance nearly impossible. But we can try to deal with these conflicts in a sensible and judicious way. When a panel does not follow or does not clearly discern the law of a circuit and utter confusion results, subsequent judges serve

bench and bar better by adhering to the law of the case than by playing pick and choose among the cases precedent.